IN THE MATTER OF: C.M. AND M.H.M.

No. COA08-1551

(Filed 7 July 2009)

1. **Appeal and Error— preservation of issues—failure to argue**

   The assignments of error that respondents failed to argue in their brief are deemed abandoned under N.C. R. App. P. 28(b)(6).

2. **Child Abuse and Neglect— abuse—sufficiency of findings of fact—non-accidental injuries—clear and convincing evidence**

   The trial court did not err by concluding that the minor son was an abused juvenile because: (1) there was clear and convincing evidence to support the trial court's findings of fact that the son's injuries were inflicted by non-accidental means, the trauma occurred very close in time to and shortly before his admission to the emergency room, and the son's injuries were significant and life threatening; and (2) these findings of fact supported the court's conclusions of law that the son was an abused juvenile within the meaning of N.C.G.S. § 7B-101(1) in that a parent or other person responsible for the child's care allowed to be inflicted upon him a serious physical injury by other than acci-

**IN RE C.M. & M.H.M.**

[198 N.C. App. 53 (2009)]

dental means and created or allowed to be created a substantial risk of serious physical injury.

**3. Child Abuse and Neglect— neglect—living with person who has abused or neglected other children—instability and volatility of living conditions**

The trial court did not err by concluding that the two minor children were neglected juveniles because: (1) the trial court was permitted, although not required, to conclude that the minor daughter was neglected based on evidence that respondent father had abused the minor son since the statutory definition of a neglected child includes living with a person who has abused or neglected other children and since the Court of Appeals has held that the weight to be given that factor is a question for the trial court; and (2) the findings of fact provided clear and convincing evidence that both children were substantially at risk due to the abuse of the son, the instability and volatility of the living conditions, and the deceptive nature of respondent parents.

**4. Child Abuse and Neglect— disposition requirements—written visitation plan**

The trial court erred in a child abuse and neglect case by failing to enter a disposition which complied with N.C.G.S. § 7B-905(c), and the case is remanded for the court's establishment of a written visitation plan.

Appeal by respondents from an adjudication and disposition order entered 22 July 2008 by Judge Edward A. Pone in Cumberland County District Court. Heard in the Court of Appeals 5 May 2009.

*Staff Attorney Elizabeth Kennedy-Gurnee, for Cumberland County Department of Social Services.*

*Attorney Advocate Beth A. Hall for guardian ad litem. Janet K. Ledbetter for respondent-father appellant. Robin E. Strickland for respondent-mother appellant.*

HUNTER, JR., Robert N., Judge.

Respondent-father appeals from an adjudication and disposition order entered 22 July 2008 adjudicating his minor child M.H.M. abused and neglected. Respondent-father and respondent-mother appeal from the same order adjudicating their minor child C.M. neglected. We affirm the trial court's adjudication of M.H.M. as

abused, in that a parent or other person responsible for the juvenile's care inflicted or allowed to be inflicted upon the juvenile a serious physical injury by other than accidental means and created or allowed to be created a substantial risk of serious physical injury to the juvenile by other than accidental means; and we affirm the adjudication of M.H.M. and C.M. as neglected, in that they lived in an environment injurious to their welfare and did not receive proper care, supervision, or discipline from their parent, guardian, custodian, or caretaker. Because the trial court erred by not addressing visitation in its Adjudication and Disposition Order, we remand for written disposition of that issue.

## I. Facts

Two children C.M. and M.H.M. (hereinafter referred to by the pseudonyms "Alexander" and "Tess") are the juveniles whose welfare is involved in this appeal. Both have the same father (hereinafter referred to by the pseudonym "Phillip"), who is one respondent. Alexander's mother, wife of Phillip (hereinafter referred to as "Olympia," also a pseudonym) was not a party to this proceeding as explained *infra*. Tess's mother (hereinafter referred to as "Nicei," a pseudonym) is also a respondent. During the times relevant to the instant proceedings, Alexander and Tess resided in Nicei's dwelling.

Phillip married Olympia in 2002. Olympia, who is a citizen and resident of the United Kingdom, was deported from the United States in January 2007 and barred from return for at least ten years. Upon being deported, she left Alexander and her teenaged daughter from a prior relationship behind. Phillip became responsible for both. His wife's daughter went to school each day, but Alexander needed a caretaker.

In September 2003, during Phillip's marriage to Olympia, he picked up Nicei from the side of the road as she was walking home from the store. Phillip, who was more than twenty years older than Nicei, had an ongoing affair with her and moved her into his mother's house. When Phillip left Nicei at his mother's house, he would go home to the house he shared with Olympia.

Olympia gave birth to Alexander in September 2005. Nicei gave birth to Tess in December 2005 and obtained public housing for herself and Tess. She believed Phillip did not join them because it would violate public housing rules. Nicei did not know that Phillip was married to Olympia, and Olympia did not know about Nicei; they found out about one another just before Olympia was deported. Phillip then

IN RE C.M. & M.H.M.

[198 N.C. App. 53 (2009)]

told Nicei that he had a son, Alexander, Alexander's mother had been deported, and he needed someone to take care of Alexander. He did not tell her that he was still married to Olympia.

Nicei cared for Alexander every weekday and sometimes on the weekends as well. She considered herself Alexander's "step-mom" and treated him like he was her "own son." While Phillip hired lawyers to attempt to get his wife back, he kept Nicei "on the back burner" and busy at the apartment caring for his children. She cooked, cleaned, and did laundry for them.

Nicei lost her public housing due to Phillip coming in and out of her home. Phillip then found a house that he rented. Because Olympia was out of the country, Phillip was able to live with Nicei and two of his children. He sent Olympia's daughter to live with her father.

At the time of the underlying proceedings, Phillip admitted to having fathered sixteen children by various women. He also admitted to using aliases for deceptive purposes such as business dealings and concealing his identity from law enforcement. The record does not disclose Phillip's parental status with his other fourteen offspring.

Nicei was unemployed, very dependent on Phillip, and willing to lie to protect him. She had no job, driver's license, or house phone, and she had to rely on a cell phone, on which Phillip placed minutes for her use.

In August 2007, Nicei made statements under oath in order to obtain a Domestic Violence Protective Order against Phillip She wrote: "From December the 2nd, 2003, to August the 19th, 2007, [Phillip] would always hit me when he was mad." In the same document she explained that she was scared for her life and that he would leave marks on her. As to Alexander, Nicei wrote that "[Phillip] hits his son and leaves marks." Based on that document, she was issued an ex-parte Domestic Violence Order of Protection. In addition to obtaining the protective order, she sought shelter in February 2008.

On 4, 6, and 9 August 2007, Alexander was taken to the Emergency Room at Cape Fear Valley Medical Center ("CFVMC"). On each occasion, Phillip drove Nicei to the hospital with Alexander. Rather than going in with them, Phillip instructed Nicei to take Alexander inside the hospital, since Olympia had Medicaid for Alexander, and hospital officials would not know Nicei was not Alexander's mother.

**IN RE C.M. & M.H.M.**

[198 N.C. App. 53 (2009)]

On 4 August 2007, Alexander was feverish, had a sore in his mouth, and had stomach pain. He was diagnosed with stomatitis, given medication, and released. On 6 August 2007, Alexander's fever and stomach pain continued. He was diagnosed with herpangina, given medication, and released. On 9 August 2007, Alexander was again seen for his stomach pain. He also had a lump on the back of his head and his hair was noticeably sparse. He was diagnosed with herpangina, tinea capitis, and scalp hematoma. During this visit, Nicei advised the Emergency Room physician that Alexander had fallen a couple of days earlier. Alexander was again released with medications.

On 18 August 2007, Phillip took Alexander to the races while Nicei stayed home with Tess. He returned late that evening, and Alexander would not easily go to bed. Phillip slapped Alexander's head and told him to "shut the f— up."

The next day, Phillip, Nicei, Alexander, and Tess left the house to go grocery shopping, but Alexander did not want to go. He was dropped off at a "cousin['s]" house. After grocery shopping, they picked up Alexander, stopped by McDonald's for lunch, and went home.

During the evening hours, Nicei was cooking, cleaning, and washing clothes as well as caring for Alexander and Tess, who were asleep on the couch. She noticed that Alexander was having difficulty breathing. When she tried to awaken him, he was unresponsive. Nicei made two calls to 911. The first call came in at 7:22 p.m. and the second at 7:29 p.m., a seven minute lapse. During the first call, Nicei told the 911 operator that she had a question and stated: "I don't know if it's an emergency, but what if a person is breathing and his eye . . . one pupil is big and one is small, what does that mean?" The 911 operator declined to give medical advice but offered to give Nicei the number to call for medical assistance, or the operator could dispatch an ambulance to the residence at that time. Nicei did not request an ambulance and said she would call back. Nicei indicated in the second call that Alexander was having difficulty breathing and was unresponsive. The operator dispatched assistance. While on the phone with the 911 operator, Nicei requested that the operator call Phillip and have him come to the hospital, because she did not have cell phone minutes with which to call him. She reported that Phillip had left the residence going to Betsy Johnson Hospital in Dunn, North Carolina, to see his dying sister.

E.M.S. responded and transported Alexander to CFVMC. Phillip called a friend to go pick up Nicei and take her to the hospital. When Alexander arrived at the hospital, Phillip was already there, despite allegedly being en route to a different hospital when he received the call from the 911 operator.

At the hospital, Alexander was examined by Emergency Room physicians. Due to his difficulty breathing and lack of response, emergency medical personnel had to intubate him and place him on a ventilator in order to save his life. An examination exposed bruises on his back and chin, and a CT scan revealed a subdural hematoma.

While emergency room personnel worked to save Alexander's life, Phillip and Nicei argued in the presence of Detective Manuel DeJesus and others. Phillip's family had confronted Nicei and suggested that Phillip implicated Nicei in hurting Alexander. Nicei became angry at Phillip while he was holding Tess. Detective DeJesus had to restrain Nicei, and a nurse had to take Tess in order to remove her from the zone of danger.

Dr. David Smith, head of the Pediatric Emergency Services, first saw Alexander. Based upon history provided by Phillip and Nicei that Alexander was doing fine during the day, and based on Alexander's medical charts, medical tests, medical history, and injuries, he found that the injuries sustained by Alexander were inflicted by non-accidental trauma and were "sustained [] shortly prior to his presentation in the emergency department." Dr. Loughlin, an expert in Pediatrics concentrating in child abuse evaluations, examined Alexander and provided additional expertise and diagnosis and agreed with the preliminary diagnosis. He ordered additional testing to rule out other possible causes. Dr. Caruso, a pediatric radiologist, was called in to further assist in the care and treatment of Alexander. The doctors suspected nonaccidental trauma as the cause of the injury. Alexander remained in the hospital for a number of days. Additional tests were conducted to rule out other causes. With no other plausible medical cause for Alexander's injuries and without any explanation of any accidental injury that might have caused his traumatic brain injury, the doctors concluded that the evidence established "to a reasonable medical certainty that the trauma was caused by non-accidental means."

As a result of a 20 August 2007 referral from CFVMC, Cumberland County Department of Social Services ("DSS") on 21 August 2007 filed a petition alleging that Alexander and Tess were neglected and

IN RE C.M. & M.H.M.

[198 N.C. App. 53 (2009)]

abused juveniles. On the same day, the trial court issued a Non-Secure Custody Order awarding DSS legal custody of the juveniles with physical placement in foster care. In an order entered 22 July 2008, the trial court adjudicated Alexander to be an abused juvenile and Alexander and Tess to be neglected juveniles.

## II. Issues

On appeal, respondent-father raises three arguments. He contends that the trial court committed reversible error when it: (1) entered an order adjudicating juvenile Alexander abused without clear, cogent, and convincing evidence presented at the hearing; (2) entered an order adjudicating juveniles Alexander and Tess neglected without clear, cogent, and convincing evidence presented at the hearing; and (3) failed to order DSS to arrange, facilitate, and supervise an appropriate visitation plan expressly approved by the court in the disposition order entered on 22 July 2008, in violation of N.C. Gen. Stat. § 7B-905(c).

Respondent-mother raises two issues on appeal. She contends that the trial court erred when it (1) concluded as a matter of law that Tess was a neglected juvenile; and (2) failed to enter a disposition that complies with N.C. Gen. Stat. § 7B-905.

## III. Standard of Review

Allegations of abuse and neglect must be proven by clear and convincing evidence. "A proper review of a trial court's finding of [abuse and] neglect entails a determination of (1) whether the findings of fact are supported by 'clear and convincing evidence,' and (2) whether the legal conclusions are supported by the findings of fact." "In a non-jury [abuse and] neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." "Our review of a trial court's conclusions of law is limited to whether they are supported by the findings of fact."

*In re Pittman*, 149 N.C. App. 756, 763-64, 561 S.E.2d 560, 566 (2002) (citations omitted).

## IV. Analysis

[1] We note initially that while respondents assigned error to several of the trial court's findings of fact, they have not brought forward some of those assignments of error in their respective briefs.

IN RE C.M. & M.H.M.

[198 N.C. App. 53 (2009)]

Assignments of error that were not brought forward in the brief are deemed abandoned. N.C. R. App. P. 28(b)(6) (2007). The trial court's remaining findings of fact are deemed to be supported by competent evidence and are binding upon the parties and this Court. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

## Abuse of Alexander

[2] Respondent-father first argues that the trial court's findings of fact are insufficient to support the trial court's conclusion that Alexander was an abused juvenile. We disagree.

An abused juvenile is statutorily defined, in pertinent part, as:

Any juvenile less than 18 years of age whose parent, guardian, custodian, or caretaker:

a. Inflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means; [or]

b. Creates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means[.]

N.C. Gen. Stat. § 7B-101(1)(a)&(b) (2007). Respondent-father specifically contends that there was no clear and convincing evidence to determine whether Alexander's brain injury was caused by accidental or non-accidental means, none of the doctors testified with "reasonable medical certainty" whether the cause was accidental or non-accidental, and doctors could not say with "reasonable medical certainty" the specific mechanism or exact time that the brain injury occurred.

Dr. Loughlin, who reviewed Alexander's records, both from the evening of 19 August 2007 when he was admitted and from earlier admissions, testified that Alexander's condition was "very critical," and that the "extensive bleeding" over the surface of the brain was "acute" or "fresh" blood from the past "seven days or less." He testified that respondent-father told him that "he didn't know why [Alexander] was in the condition he was in," and that the day before Alexander was doing "fine." He testified that he could not say with "absolute certainty" as to whether Alexander's injuries were accidental or non-accidental, but that there were "a number of factors" that made him think that it was "likely that this was a non-accidental injury." Based on the location of the injury, his extensive evaluation, Alexander's age, and the history given to him, he concluded it was

**IN RE C.M. & M.H.M.**

[198 N.C. App. 53 (2009)]

"likely that this was non-accidental." He stated: "[M]y feeling it is likely to have been non-accidental injury, but I can't tell you exactly what caused the injury or exactly what time it occurred. . . . Given the severity of his injury when he arrived at the emergency room, I think it's unlikely to have been accidental."

Dr. Caruso, when asked to opine as to "a reasonable medical certainty as to the type of cranial injury" that caused Alexander's injuries, testified that the scalp swelling "indicates a nonspecific blow to the head." He testified that the swelling, subdural hematoma, and midline shift "wouldn't be explained by something . . . ten days earlier," and that the injury happened "most likely within a . . . day or on the day of the admission[.]" He testified that the injury would not be a result of the average type of head bump, but rather he analogized it to an impact coming from a motor vehicle accident.

Dr. Smith testified that he had received no plausible explanation for how the injury could have occurred. He was suspicious and concerned that Alexander had been the victim of abusive injury. He deemed Alexander's brain injuries to be the result of an abusive or non-accidental injury and explained that the scalp hemorrhage came from a high-impact trauma or blow to the back of the head. Based on the swelling and bleeding of the initial CT scan, he believed the injury was sustained likely very close to the time of presentation at the emergency room, at most within a few hours. When asked whether he had an opinion as to a "reasonable medical certainty" as to the cause of Alexander's presentation to the emergency room on 19 August, he opined that Alexander "sustained a high-impact injury to the head that caused . . . the injury pattern . . . and that he sustained it shortly prior to his presentation in the emergency department." When asked his opinion to a "reasonable medical certainty" whether Alexander's injuries were accidental or non-accidental, he stated, based on the history and medical investigation, that Alexander "sustained an abusive or non-accidental injury as the source of the brain swelling and . . . bleeding that was seen on the initial CAT scans."

Defense witness Dr. Peter Stephens, a pathologist, opined that "to a reasonable degree of medical certainty" Alexander's injuries were "more probably accidental." He also explained, however, that a five-day delay between any accident and the period of unresponsiveness with which Alexander presented would be unlikely and explainable only by a repeated fall between 14 August and 19 August. He admitted the record showed no evidence of a second fall.

**IN RE C.M. & M.H.M.**

[198 N.C. App. 53 (2009)]

In addition to the doctors' testimony in support of the trauma being inflicted immediately prior to Alexander's being seen by emergency medical personnel, the trial court's findings included a photograph admitted into evidence at the hearing that showed no noticeable swelling to Alexander's head earlier in the day. On admission to the hospital, however, Alexander had significant swelling due to a large scalp hematoma to the back of his head on both the left and right sides. Alexander also had subdural hematomas and profuse swelling of the right side of the brain. A review of the CT scans and MRI readings indicated that the only blood was acute blood. The swelling of the brain increased over a period of three or so days peaking on or about 23 August 2007. The trial court found this was consistent with the injury being inflicted very close in time to the hospital admission.

The trial court also found that respondent-mother told Social Worker Nunnery that earlier during the day of 19 August 2007, respondent-father slapped Alexander up beside the head and said to "shut the f— up." She reported that Alexander did not look right afterward and he urinated on the sofa, prior to being taken to CFVMC.

We hold that there is clear and convincing evidence to support the trial court's findings of fact that Alexander's injuries were inflicted by non-accidental means, the trauma occurred "very close in time" to and "shortly before" his admission to CFVMC, and Alexander's injuries were "significant and life threatening." These findings of fact support the court's conclusions of law that Alexander was an abused juvenile within the meaning of N.C. Gen. Stat. § 7B-101(1), in that a parent or other person responsible for Alexander's care allowed to be inflicted upon him a serious physical injury by other than accidental means and created or allowed to be created a substantial risk of serious physical injury to Alexander by other than accidental means. See In re Pittman, 149 N.C. App. at 763-64, 561 S.E.2d at 566. We deem the trial court's findings of fact conclusive, because they are supported by clear and convincing competent evidence. See id. Accordingly, respondent-father's assignments of error related to the adjudication of Alexander as an abused juvenile are overruled.

**Neglect of Alexander and Tess**

[3] Respondent-father also contends the trial court's findings of fact are insufficient to support the trial court's conclusion that Alexander

**IN RE C.M. & M.H.M.**

[198 N.C. App. 53 (2009)]

and Tess are neglected juveniles. Respondent-father argues that there was a lack of clear and convincing evidence to find neglect, and bases his argument on his previous argument that there was not clear and convincing evidence to find abuse of Alexander.

Respondent-mother contends the trial court's findings of fact are insufficient to support the trial court's conclusion that Tess is a neglected juvenile. In assessing whether Tess is neglected, we consider the standard set forth in *In re Montgomery*, which states: "[T]he determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent." 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984). Respondent-mother argues that Tess "just happened to be another child in the home," that "[n]othing in the record suggests that the home itself was improper for [Tess]," and that the court's conclusion as to Tess's lack of "proper care, supervision or discipline" was unfounded. We disagree with both respondent-father and respondent-mother.

N.C. Gen. Stat. § 7B-101(15) defines a neglected juvenile as one

who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, *it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.*"

N.C. Gen. Stat. § 7B-101(15) (emphasis added). While each of the above criteria is sufficient to establish neglect, the trial court's findings must be based upon the evidence presented.

This Court has " 'required that there be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide "proper care, supervision, or discipline" in order to adjudicate a juvenile neglected.' " *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (citations omitted); *see also In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (listing cases holding that a substantial risk of impairment is sufficient to show neglect).

IN RE C.M. & M.H.M.

[198 N.C. App. 53 (2009)]

As to the neglect of Alexander, the trial court found that Alexander sustained life-threatening trauma that was non-accidental; respondent-father gave a medical history which was inconsistent with the injuries sustained by Alexander; respondent-father and respondent-mother adapted their story to try to link Alexander's injuries with an earlier alleged fall; and there was no credible medical evidence to find a relationship between injuries received by Alexander on 9 August 2007 with the condition with which he presented on 19 August 2007.

Respondent-mother, in her brief, states: "[Phillip] · contributed money and corporal punishment to the family, but little else," and "[Phillip]. . . . disciplined the children, sometimes leaving marks behind." In addition, respondent-mother at first denied ambulance care for Alexander even when she stated to the 911 operator that one of his pupil's was big and one was small. Regarding the 911 call, it is particularly telling that the attorney for respondent-father stated at the hearing: "I know that I would have to concede on the neglect . . . due to the 911 call when they asked about an ambulance and she said no . . . and, at that point knew he could be injured[.]"

In considering the neglect of Tess, the trial court found that respondent-mother was deceptive, unemployed, very dependent on respondent-father, had no driver's license, and had no phone use unless respondent-father put minutes on her cell phone. The court found that during the volatile argument between respondent-father and respondent-mother at the hospital, Tess had to be kept out of harm's way and out of the zone of danger. The court also found that respondent-father was physically abusive at times to respondent-mother, acts of domestic violence had occurred in the presence of the juveniles, and respondent-mother had taken out a Domestic Violence Protective Order against respondent-father.

Respondent-mother later testified that she made the statements in obtaining the protective order "to get even with [Phillip]" for threatening to take her daughter, and that respondent-father had hit her only in "[p]laying around." Her testimony changed again in response to the question: "Has [Phillip] ever hit you?", to which she replied: "Yes. Sometimes; on occasion." She then confirmed that she did not want to get respondent-father in trouble and that she wanted to be with him. She testified during the hearing that respondent-father had warned her about what she should say to the social workers and the police. The court observed during the hearing that respondent-mother "rarely made any decisions without first consult-

**IN RE C.M. & M.H.M.**

[198 N.C. App. 53 (2009)]

ing with [Phillip] . . . often . . . to the irritation and sometimes the objection of her counsel of record."

In an apparent attempt to minimize her own culpability for neglect of Tess, respondent-mother posits in her brief that she "[w]as more like a servant than a girlfriend" to respondent-father; that she "relies upon [Phillip] for food, transportation, and cell phone minutes"; and that "[e]verything about their relationship was one-sided." She admittedly had no knowledge of respondent-father's other life, and she stated that she "complied with instructions" respondent-father gave her.

Although she argues she provided a "stable environment" for Tess, we fail to see how an environment in which a mother who considers herself a servant to a deceitful, abusive partner and father is "stable." That she has no other means of support or connection to the outside world, other than through respondent-father, is of great concern. Her claim that Tess was not at a "substantial risk of harm" by living in such an environment rings hollow considering the surrounding circumstances discussed *supra*, particularly the volatile nature of the relationship and respondent-father's abuse of Alexander. As to the "proper care, supervision or discipline" Tess received from her parents, respondent-mother admitted in her brief that respondent-father had "inappropriately disciplined" Tess and that he "disciplined the children, sometimes leaving marks behind."

Moreover, while the language regarding abuse or neglect of other children "does not mandate" the trial court's conclusion of neglect, the trial judge has "discretion in determining the weight to be given such evidence." *In re Nicholson*, 114 N.C. App. 91, 94, 440 S.E.2d 852, 854 (1994) (construing the identically worded statutory predecessor to § 7B-101). Since the statutory definition of a neglected child includes living with a person who has abused or neglected other children, and since this Court has held that the weight to be given that factor is a question for the trial court, the trial court, in this case, was permitted, although not required, to conclude that Tess was neglected based on evidence that respondent-father had abused Alexander. *See, e.g., In re A.S.*, 190 N.C. App. 679, 690, 661 S.E.2d 313, 321 (2008) (affirming the trial court's adjudication of neglect of one child based on evidence that respondent had abused another child by intentionally burning her), *affirmed per curiam*, 363 N.C. 254, 675 S.E.2d 361 (2009); *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005) (affirming adjudication of neglect of one child based on prior adjudication of neglect with respect to other children and lack of accepting

IN RE C.M. & M.H.M.

[198 N.C. App. 53 (2009)]

responsibility). With this Court's determination *supra* that Alexander was properly adjudicated abused, any weight given by the trial court to the abuse adjudication in determining Tess's neglect was proper.

In this case, the findings of fact provide clear and convincing evidence that both Alexander and Tess were substantially at risk due to the abuse of Alexander, the instability and volatility of the living conditions, and the deceptive nature of the respondent-father and respondent-mother. *See In re Helms*, 127 N.C. App. at 511, 491 S.E.2d at 676. Furthermore, the environment in which they lived was injurious in that it involved violence. The trial court's findings of fact therefore support the conclusion of law that Alexander and Tess are neglected juveniles. Accordingly, respondent-father's and respondent-mother's assignments of error related to the adjudication of Alexander and Tess as neglected juveniles are overruled.

**Written Visitation Order**

**[4]** The parties next argue that the trial court erred by failing to enter a disposition which complies with N.C. Gen. Stat. § 7B-905(c). We agree.

N.C. Gen. Stat. § 7B-905(c) (2007) provides:

Any dispositional order under which a juvenile is removed from the custody of a parent, guardian, custodian, or caretaker, or under which the juvenile's placement is continued outside the home *shall provide for appropriate visitation* as may be in the best interests of the juvenile and consistent with the juvenile's health and safety. If the juvenile is placed in the custody or placement responsibility of a county department of social services, the court may order the director to arrange, facilitate, and supervise a visitation plan expressly approved by the court.

(Emphasis added.) Thus, whether a trial court decides to allow visitation or not, its dispositional order must include an order regarding visitation. *In re E.C.*, 174 N.C. App. 517, 522, 621 S.E.2d 647, 651 (2005) ("The trial court maintains the responsibility to ensure that an appropriate visitation plan is established within the dispositional order."). If a court finds that visitation would not be in the best interest and welfare of the child, the court may deny the parent visitation rights. *In re Custody of Stancil*, 10 N.C. App. 545, 552, 179 S.E.2d 844, 849 (1971). If the court does not make such findings, however, "the court should safeguard the parent's visitation rights by a provision in the order defining and establishing the time, place and con-

ditions under which such visitation rights may be exercised." *Id.*; *see also In re E.C.*, 174 N.C. App. at 523, 621 S.E.2d at 652 ("An appropriate visitation plan must provide for a minimum outline of visitation such as the time, place, and conditions under which visitation may be exercised.").

We hold that, pursuant to statutory requisites, the trial court erred by not addressing visitation in its dispositional order. We therefore remand for the court's establishment of a written visitation plan.

## Conclusion

We affirm the trial court's adjudication of abuse of Alexander in that a parent or other person responsible for Alexander's care allowed to be inflicted upon him a serious physical injury by other than accidental means and created or allowed to be created a substantial risk of serious physical injury to Alexander by other than accidental means. We further affirm the trial court's adjudication of neglect of Alexander and Tess where the juveniles were substantially at risk due to the abuse of Alexander, the instability and volatility of the living conditions, and the deceptive nature of the respondent-father and respondent-mother. The juveniles were also at risk due to violence in the home. We remand for written disposition of child visitation orders.

Affirmed and remanded.

Judges WYNN and JACKSON concur.