IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1147

Filed: 19 November 2019

Lincoln County, Nos. 17 JA 72-74

IN THE MATTER OF: S.G., A.G., and F.C.

Appeal by Respondents from order entered 28 June 2018 by Judge Ali B. Paksoy and order entered 27 July 2018 by Judge Jeannette R. Reeves in District Court, Lincoln County. Heard in the Court of Appeals 3 October 2019.

> *Lauren Vaughan for Petitioner-Appellee Lincoln County Department of Social Services.*
>
> *J. Thomas Diepenbrock for Respondent-Appellant Father.*
>
> *Parent Defender Wendy C. Sotolongo, by Deputy Parent Defender Annick Lenoir-Peek, for Respondent-Appellant Mother.*
>
> *Parker Poe Adams & Bernstein LLP, by Michael J. Crook and Joshua J. Morales, for Guardian ad Litem.*

McGEE, Chief Judge.

Respondents appeal from an order adjudicating the minor child F.C. to be an abused, neglected, and dependent juvenile and the minor children S.G. and A.G. to be neglected and dependent juveniles. Respondents also appeal from a disposition and permanency planning order requiring them to engage in services and establishing visitation. We affirm the adjudication order, affirm in part and vacate

in part the disposition/permanency planning order, and remand for entry of an appropriate visitation order.

## I. Background

Respondent-Mother is the mother of all three children. She is in a relationship with Respondent-Father, who is the father of S.G. and A.G. F.C.'s father is deceased. On 18 July 2017, the Lincoln County Department of Social Services ("DSS") received a report alleging that three-year-old F.C. was seen with a black eye that resulted from Respondent-Father pushing him down and hitting him. A social worker went to Respondents' home to investigate, but Respondents appeared to be intentionally evading the social worker, until the social worker called law enforcement, and Respondents finally opened their door. Respondents both denied to the social worker that Respondent-Father hit F.C., instead claiming that F.C. had been running through the house with the dog when he tripped and hit his head on a coffee table. The social worker informed Respondent-Father that he would have to leave the residence while the matter was being investigated. The social worker stayed at the home until Respondent-Father left.

The next day, another social worker informed Respondent-Mother that Respondent-Father could not have contact with F.C. until F.C. was given a forensic interview. F.C. was seen by Dr. Melissa Will ("Dr. Will"), who found "a red patterned bruise covering [F.C.'s right] forehead (pattern of rectangle with 3 vertic[al] lines within it), also unpatterned bruise lateral to this; also bruise of his upper eyelid[.]"

It was Dr. Will's opinion that the unusual pattern of the bruise was inconsistent with Respondent-Mother's explanation that F.C. hit his head on a coffee table.

DSS decided that Respondent-Father could not have any contact with the children. "Respondent-Mother was asked to take all three children and keep [] Respondent-Father away from them. [] Respondent-Mother wanted to be with [Respondent-Father] and preferred that [Respondent-Father] come home and the three children go somewhere else. [] Respondent-Mother would not agree to keep the children away from [Respondent-Father]." The children were placed with a paternal relative, who later became unable to care for them.

On 24 July 2017, DSS filed petitions alleging that F.C. was an abused, neglected, and dependent juvenile; and alleging that S.G. and A.G. were neglected and dependent juveniles. DSS obtained nonsecure custody of the children the same day. The trial court held an adjudicatory hearing on 20 February and 15 April 2018, after which the trial court entered a 28 June 2018 order adjudicating F.C. to be abused and all three children to be neglected and dependent.

The trial court conducted a disposition and permanency planning hearing on 17 July 2018. The trial court's 27 July 2018 order established a visitation plan of "one visit each month" with Respondents' respective children. Contact between Respondent-Father and F.C. was to be based on the recommendations of F.C.'s therapist. The trial court also ordered Respondents to submit to substance abuse and mental health assessments and follow all recommendations, participate in parenting

classes and demonstrate skills learned during visits, obtain and maintain safe and stable housing, and submit to random drug screens. Respondents appeal.

## II. Adjudication

Respondent-Father argues that the trial court erred by adjudicating F.C. as an abused juvenile.[1] Both Respondents argue that the trial court erroneously adjudicated S.G. and A.G. as neglected juveniles. We address each argument in turn.

### A. *Standard of Review*

When reviewing an adjudication of abuse, neglect, or dependency, this Court determines whether the trial court's findings of fact are supported by clear and convincing evidence and whether the trial court's legal conclusions are supported by its findings of fact. *See In re C.M. & M.H.M.*, 198 N.C. App. 53, 59, 678 S.E.2d 794, 798 (2009). Findings of fact which are "supported by clear and convincing competent evidence are deemed conclusive [on appeal], even where some evidence supports contrary findings." *Id.* (quotation marks and citation omitted). The trial court's conclusions of law are reviewed *de novo*. *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006) (citation omitted).

### B. *Abuse*

---

[1] Respondent-Mother does not challenge the trial court's abuse adjudication. Neither Respondent challenges the court's adjudication of F.C. as neglected or its adjudication of all three children as dependent.

The trial court concluded that F.C. was abused under N.C.G.S. § 7B-101(1)(a) and (b) (2017). These subsections define an abused juvenile, in relevant part, as one whose parent:

> a. Inflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means;
>
> b. Creates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means[.]

*Id.*

Respondent-Father first contends that neither the evidence nor the trial court's findings support its conclusion that F.C. suffered a "serious physical injury." He argues that F.C. did not suffer the type of "significant physical injuries" that provided support for the abuse adjudications upheld by this Court in cases such as *In re Hayden*, 96 N.C. App. 77, 83, 384 S.E.2d 558, 562 (1989) (child "suffered multiple burns over a wide portion of her body") and *In re T.H.T.*, 185 N.C. App. 337, 345-46, 648 S.E.2d 519, 525 (2007) (child suffered skull fracture), *aff'd as modified*, 362 N.C. 446, 665 S.E.2d 54 (2008).

However, the cases cited by Respondent-Father did not establish a *minimum threshold* for a serious injury. As this Court has explained, "the nature of an injury is dependent upon the facts of each case[.]" *In re L.T.R. & J.M.R.*, 181 N.C. App. 376, 383, 639 S.E.2d 122, 126 (2007). Using this standard, we previously upheld an abuse

adjudication when a three-year-old child suffered "a dark, six-inch bruise, which lasted well over one week, on his right thigh." *Id.* at 382, 639 S.E.2d at 126.

In this case, the trial court made a number of findings about three-year-old F.C.'s injury. He "had a significant bruise on his forehead, above his eye" when a DSS social worker observed him on the night of 18 July 2017. Then, during a medical examination the following day, F.C. was found to have "bruising on his right forehead with an unusual pattern[.] It was a red patterned bruise covering his right forehead, the pattern of a rectangle with three vertical lines within it. There was also a patterned bruise lateral to this, in addition to a bruise on his upper eyelid." A 21 July 2017 examination "revealed bruising to the right eyelid and on [F.C.'s] forehead was a knot, raised, with a very distinct patterned bruise." Finally, the trial court found that "[t]he bruise was visible at least four days after the incident." These findings were sufficient to support the trial court's conclusion that F.C. suffered a serious injury.

Respondent-Father next contends that neither the evidence nor the trial court's findings support the conclusion that F.C.'s injury or risk of injury occurred through non-accidental means. He argues that "cases involving an adjudication of physical abuse typically include medical opinions . . . that the injuries were inflicted by non-accidental means" and that such opinions were absent here.

Respondent-Father cites three cases to support his contention: *In re L.Z.A.*, 249 N.C. App. 628, 792 S.E.2d 160 (2016); *C.M.*, 198 N.C. App. 53, 678 S.E.2d 794; and

*T.H.T.*, 185 N.C. App. 337, 648 S.E.2d 519.  While he is correct that each of these cases, in upholding abuse adjudications, noted there was medical testimony that the child suffered a non-accidental injury, these cases do not hold that similar medical testimony is a requirement.  In this case, no medical expert explicitly testified that F.C.'s injuries occurred through non-accidental means, but there was ample medical evidence from which the trial court could determine that F.C.'s injuries were not caused by accident.  Dr. Will testified that Respondent-Mother's claim that F.C.'s injury resulted from falling and hitting his head on the coffee table was inconsistent with the nature of the injuries.  Moreover, a forensic nurse examiner testified that F.C.'s bruising was "definitely consistent with having been hit with a belt buckle[,]" rather than consistent with F.C.'s head hitting a wall, a table, or the floor.  When presented photographs of the table during the adjudication hearing, the nurse testified, "I don't see anything on that table that would intimate to me that that pattern would have shown up from being hit."

Based on the unobjected-to testimony of the two medical professionals above, the trial court found that F.C.'s bruise "was consistent with having been hit with a belt buckle" and "was not consistent with the child's head hitting a table, a wall, or the floor."  This finding, coupled with the findings about the severity of F.C.'s injury, fully supported the trial court's determination that "Respondents have inflicted or allowed to be inflicted on [F.C.] a serious physical injury by other than accidental

means." Thus, the trial court appropriately adjudicated F.C. as an abused juvenile. Respondent-Father's arguments are overruled.

### C. *Neglect*

The Juvenile Code defines a neglected juvenile, in relevant part, as one

> Who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; . . . or who lives in an environment injurious to the juvenile's welfare[.] In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C.G.S. § 7B-101(15) (2017).[2] "Since the statutory definition of a neglected child includes living with a person who neglected [or abused] other children[,]" "the trial judge has discretion in determining the weight to be given" to evidence of another child's abuse or neglect in determining whether a child is neglected. *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005) (quotation marks and citation omitted).

"In order to adjudicate a child to be neglected, the failure to provide proper care, supervision, or discipline must result in some type of physical, mental, or emotional impairment *or a substantial risk of such impairment*." *In re C.M.*, 183 N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007) (emphasis added) (citation omitted).

---

[2] This definition has been amended, in a manner not relevant to this case, by legislation that became effective after the entry of the trial court's order. *See* 2018 N.C. Sess. 68 § 8.1(b).

Respondents contend that there was no evidence that S.G. or A.G. suffered any impairment or substantial risk of impairment, and that their neglect adjudication was based solely on the fact they lived with F.C.

However, in addition to the findings relevant to its conclusion that F.C. was an abused juvenile, the trial court made additional findings of fact supporting its determination that S.G. and A.G. were neglected juveniles:

> 27. After the CAC interview with the minor child, [F.C.], which was on July 20, 2017, [DSS] determined that [] Respondent[-]Father could not be around the children. [] Respondent[-]Mother was asked to take all three children and keep [] Respondent[-]Father away from them. [] Respondent[-]Mother wanted to be with [Respondent-Father] and preferred that [Respondent-]Father come home and the three children go somewhere else. [] Respondent[-]Mother would not agree to keep the children away from [Respondent-]Father.
>
> . . . .
>
> 40. After the CAC interview on July 20, 2017, [] Respondent[-]Mother did not believe what the child reported. []Respondent[-]Mother believed [] Respondent[-]Father's story over the child's and wanted [] Respondent[-]Father back in the home. [] Respondent[-]Mother did not believe she could protect the children from [] Respondent[-]Father. There were no other placement options found and [] Respondent[-]Mother would rather have the children leave and [] Respondent[-]Father come home.
>
> . . . .
>
> 44. Respondent[s] have continued to deny any responsibility for the injuries to [F.C.].

> 45. That the failure to acknowledge responsibility, . . . [Respondent-Mother's] inability to protect the children, [Respondents'] avoidance of DSS workers, and the other facts of this case lead to the conclusion that there is a risk of future harm to the children.
>
> 46. That the juveniles, [S.G.] and [A.G.], have lived in a home where another juvenile, their older brother [F.C.], had been subjected to abuse and neglect by adults who regularly live in the home.

Based on these findings, the trial court concluded that the children "have not received proper care, supervision or discipline from [Respondents] and they have lived in an environment injurious to [their] welfare."

The trial court's findings above were supported by competent evidence[3] and show that, contrary to Respondents' arguments, the trial court's conclusion that S.G. and A.G. were neglected juveniles was not supported solely by its finding that they lived in a home where F.C. was abused and neglected. Rather, the trial court also considered that Respondent-Father had not been allowed to have contact with the children and, therefore, could not provide care and that Respondent-Mother chose to be with Respondent-Father rather than to provide housing, care, and love to the children. Furthermore, even after medical professionals provided unobjected-to opinion testimony that F.C.'s injuries could not have occurred in the way Respondents

---

[3] Respondents challenge findings and portions of findings not quoted above. Since the quoted findings were sufficient to support the court's neglect adjudication, we do not address these challenges. *See In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006) ("When, however, ample other findings of fact support an adjudication . . ., erroneous findings unnecessary to the determination do not constitute reversible error.").

described, Respondents still refused to take any responsibility for F.C.'s injuries. After the incident where F.C. was abused, Respondent-Mother would not care for the children if it meant she could not be with Respondent-Father. Considered together, these factors support the trial court's determination that there was a risk of future harm to the children if they remained in Respondents' care. Accordingly, the trial court did not err by concluding S.G. and A.G. were neglected juveniles.

### III. Disposition

Respondents contend that the trial court erred in ordering them to engage in services that were not necessary to remedy the conditions that led or contributed to the adjudications. Specifically, Respondents contest the trial court's authority to order them to: (1) complete a substance abuse assessment and follow all recommendations; (2) complete a mental health assessment and follow all recommendations; (3) obtain and maintain safe and stable housing; and (4) submit to random drug screens.

> The North Carolina General Statutes permit the trial court at its discretion to
>
>> determine whether the best interests of the juvenile require that the parent . . . undergo psychiatric, psychological, or other treatment or counseling directed toward remediating or remedying behaviors or conditions that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent. . . . If the court finds that the best interests of the juvenile require the parent . . . [to] undergo treatment, it may order that individual to comply with a plan of treatment[.]

*In re A.S.& M.J.W.*, 181 N.C. App. 706, 712, 640 S.E.2d 817, 821 (2007) (quoting

N.C.G.S. § 7B-904(c) (2005)). N.C.G.S. § 7B-904 also allows the trial court to order a

parent to "take appropriate steps" in order to achieve reunification. N.C.G.S. § 7B-

904(d1)(3) (2017). "For a court to properly exercise the authority permitted by this

provision, there must be a nexus between the step ordered by the court and a

condition that is found or alleged to have led to or contributed to the adjudication."

*In re T.N.G.*, 244 N.C. App. 398, 408, 781 S.E.2d 93, 101 (2015) (citation omitted); *In

re B.O.A.*, __ N.C. __, __, 831 S.E.2d  305, 314-15 (2019). However, the trial court is

not limited to ordering services which directly address the reasons for the children's

removal from a parent's custody. It may also order services which could aid "in both

understanding and resolving the possible underlying causes" of the actions that

contributed to the trial court's removal decision. *In re A.R.*, 227 N.C. App. 518, 522,

742 S.E.2d 629, 632-33 (2013). Further:

> [N.C.G.S.] § 7B-901 provides that the "dispositional
> hearing may be informal and the court may consider
> written reports or other evidence concerning the needs of
> the juvenile[.] The court may consider any evidence,
> including hearsay evidence as defined in G.S. 8C–1, Rule
> 801[.]" "We review a dispositional order only for abuse of
> discretion. 'An abuse of discretion occurs when the trial
> court's ruling is so arbitrary that it could not have been the
> result of a reasoned decision.'"

*T.N.G.*, 244 N.C. App. at 408, 781 S.E.2d at 100 (citations omitted).

In this case, the children were removed primarily as a result of F.C.'s non-accidental injuries, Respondents' refusal to accept responsibility therefore, and Respondent-Mother's refusal to care for the children if it meant that Respondent-Father could not remain in the home with her. DSS also alleged in the juvenile petitions that it received reports from several sources that Respondents "were using unidentified illegal substances." Based on the allegations in the petition and the facts found in the adjudication order, the trial court acted within its discretion by requiring Respondents to receive and comply with mental health and substance abuse evaluations and submit to drug screens. These directives would, at minimum, assist the trial court, DSS, and Respondents in understanding whether substance abuse or mental health issues were underlying causes for F.C.'s abuse and the children's neglect. *See A.R.*, 227 N.C. App. at 522–23, 742 S.E.2d at 632–33 (concluding that mental health assessments, substance abuse evaluations, and drug screens would assist "in both understanding and resolving the possible underlying causes of respondents' domestic violence issues"). Thus, the trial court did not abuse its discretion in setting these requirements, as they are "reasonably related to aiding [R]espondents in remedying the conditions which led to the children's removal[.]" *Id.* at 522, 742 S.E.2d at 632.

Respondents further argue that the trial court erred in ordering them to "obtain and maintain safe and stable housing[,]" because this condition was not related to the issues resulting in the children's removal. Respondent-Mother

contends "there were no findings of fact addressing the lack of safe and stable housing[,]" and that '[t]he entire adjudication was premised on F.C.'s injury, and not on the status of the house as unsuitable." Relying on N.C.G.S. § 7B-904, Respondent-Father also contends that because the adjudication order did not include findings that that the children's housing was a factor in the adjudications of abuse, neglect, and dependency, the trial court was without authority to order Respondents to obtain and maintain safe and stable housing.

It is true that this Court has held the trial court erred in ordering conditions concerning a respondent-parent's housing when "the petitions did not allege and the district court did not find as fact that [housing] issues led to the juveniles' removal from [the respondent's] custody or formed the basis for their adjudications." *In re H.H.*, 237 N.C. App. 431, 440, 767 S.E.2d 347, 353 (2014); *see also In re W.V.*, 204 N.C. App. 290, 297, 693 S.E.2d 383, 388 (2010) (vacating the portion of the dispositional order requiring the parent to obtain and maintain stable employment where "[n]othing in the record suggests that respondent's employment situation, or lack thereof, led to or contributed to the juvenile's adjudication"). However, in 2019, our Supreme Court in *B.O.A.* overruled this Court's narrow application of N.C.G.S. § 7B-904.[4]

---

[4] Although this Court did not consider N.C.G.S. § 7B-904 in *B.O.A.*, our Supreme Court construed it, along with N.C.G.S. § 7B-1111(a)(2), in order to reach its holding.

In *B.O.A.*, review of the record reveals that the infant child was alleged to have been a neglected juvenile, based upon an allegation that she "'live[d] in an environment injurious to the juvenile's welfare.'" *B.O.A.*, __ N.C. at __, 831 S.E.2d at 307. The petition was based on allegations that the child's father "choked" the child's mother while the child was present during an altercation at their home. Law enforcement "found [the child] to have a bruise on her right forearm going to her . . . hand" that a doctor testified "was unlikely to have come from the child's bouncy seat" as maintained by the mother. The mother had also been "charged for assault on a juvenile in June 2015" for allegedly throwing a shoe and injuring the eye of the child's three-year-old sibling. The adjudication order included findings supporting the allegations of domestic abuse of the mother by the father, the child having likely been injured by one of her parents, and the opinion of a nurse familiar with the histories of both the child and the mother that the "juvenile's safety [wa]s at risk." The trial court found the child was "living in an injurious environment with [the parents] and [was] a neglected juvenile as defined by law." The disposition order was entered with the adjudication order, and the mother was ordered to follow an Out of Home Service Agreement that required her, *inter alia*, to: obtain mental health assessments and follow recommendations; attend certain domestic violence and sexual abuse group meetings; take certain medications; submit to random drug screens; and "obtain and maintain stable income for at least 3 consecutive months."

On appeal, our Supreme Court stated: "The ultimate issue before us in this case revolves around the manner in which the reference to 'those conditions that led to the removal of the juvenile' contained in N.C.G.S. § 7B-1111(a)(2) should be construed." *B.O.A.*, __ N.C. at __, 831 S.E.2d at 311. The mother argued that "domestic violence and the bruise" were the sole conditions that "caused" the child's removal, and that *when DSS filed the petition*, it "did not know whether [the child] was at risk because [the mother] had medication management issues[,]" whether the mother had "any mental health issues" affecting the child's welfare, or whether the mother had insufficient "parenting skills." The mother noted that the trial court "did not find that domestic violence was caused by substance abuse, mental health issues, parenting skills, or medication management." The mother further argued that conditions that she continue participating in "'a Sexual Abuse Survivors group[,]'" not talk with the child about the case or "adult issues," and "maintain stable income[,]" "were not removal conditions" and, therefore, could not be considered as bases to terminate her parental rights pursuant to N.C.G.S. § 7B-1111(a)(2).

Our Supreme Court disagreed, relying in part on N.C.G.S. § 7B-904:

> According to N.C.G.S. § 7B-904(d1)(3), a trial judge has the authority to require the parent of a juvenile who has been adjudicated to be abused, neglected, or dependent to "[t]ake appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent, guardian, custodian, or caretaker." After examining N.C.G.S. § 7B-904(d1)(3), we believe that the General Assembly clearly contemplated that, in the event

that a juvenile is found to have been abused, neglected, or dependent, the trial judge has the authority to order a parent to take *any step needed to remediate the conditions that "led to or contributed to" either the juvenile's adjudication or the decision to divest the parent of custody.* Put another way, the trial judge in an abuse, neglect, or dependency proceeding has the *authority to order a parent to take any step reasonably required to alleviate any condition* that directly or indirectly contributed to causing the juvenile's removal from the parental home. In addition, N.C.G.S. § 7B-904(d1)(3) authorizes the trial judge, as he or she gains a better understanding of the relevant family dynamic, *to modify and update a parent's case plan* in subsequent review proceedings conducted pursuant to N.C.G.S. § 7B-906.1. Thus, the relevant statutory provisions appear to contemplate an ongoing examination of the circumstances that surrounded the juvenile's removal from the home and the steps that need to be taken in order to remediate both the direct and the indirect underlying causes of the juvenile's removal from the parental home[.]

*B.O.A.*, __ N.C. at __, 831 S.E.2d at 311–12 (emphasis added). The Court further

concluded:

[N]othing in the relevant statutory language suggests that the only "conditions of removal" that are relevant to a determination of whether a particular parent's parental rights in a particular child are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2) are limited to those which are explicitly set out in a petition seeking the entry of a nonsecure custody order or a determination that a particular child is an abused, neglected, or dependent juvenile. Instead, the relevant statutory language appears to us to be subject to a number of potentially possible interpretations in addition to that adopted by the Court of Appeals. For example, the relevant statutory language can easily be read to encompass all of the conditions that led to the child's removal from the parental home, including both those inherent in the events immediately surrounding the

child's removal from the home and any additional underlying factors that contributed to the difficulties that resulted in the child's removal. A careful examination of the relevant statutory language in the context of other related statutory provisions suggests that a more expansive reading of the reference to "those conditions that led to the removal of the juvenile" contained in N.C.G.S. § 7B-1111(a)(2) is the appropriate one.

*B.O.A.*, __ N.C. at __, 831 S.E.2d at 311.

Although *B.O.A.* was an appeal from a termination order, we find its analysis of N.C.G.S. § 7B-904 binding, and can conceive of no reason why the trial court's imposition of conditions for reunification would be "limited to those [conditions] which are explicitly set out in a petition seeking the entry of a nonsecure custody order or [as findings of fact in] a determination that a particular child is an abused, neglected, or dependent juvenile[,]" when the trial court is free to impose any conditions it believes are relevant to addressing the issues that led to a child's removal—at any time and based upon new or existing evidence—so long as it does not abuse its discretion. *B.O.A.*, __ N.C. at __, 831 S.E.2d at 311.

We believe cases such as *H.H.*, 237 N.C. App. 431, 767 S.E.2d 347 and *W.V.*, 204 N.C. App. 290, 693 S.E.2d 383, relied upon by Respondents, which hold "the court lacked authority to order [the respondent-]mother to maintain stable housing and employment" when "the petitions did not allege and the district court did not find as fact [in its adjudication order] that these issues led to the juveniles' removal from [the respondent-]mother's custody or formed the basis for their adjudications[,]" *H.H.*, 237

N.C. App. at 440, 767 S.E.2d at 353, are in conflict with *B.O.A.* To the extent that *H.H.*, *W.V.*, and other opinions of this Court are in conflict with the analysis and holdings in *B.O.A.*, they have been overruled. *Id.* at __, 831 S.E.2d at 312 (rejecting the reasoning of the Court of Appeals "that the trial court was not entitled to consider certain of the 'conditions' addressed in respondent-mother's court-approved case plan because 'DSS failed to allege any of these conditions in either the nonsecure custody order or neglect petition to put [r]espondent on notice of these conditions'").

In this case, DSS included in the "Other Significant Information" section of its 12 July 2018 "Model Court Report for Permanency Planning Hearings" that Respondents had provided DSS with a P.O. Box, but

> refuse[d] to disclose their physical address to [DSS]. They had previously provided an address on Sigmon Street. [Respondent-Father] reported they had issues with the rent and left that residence, to return to their former address on Sunnyhill Road. Child support attempted to serve [Respondents] at both locations, and were informed they do not reside at either location.

DSS recommended that both Respondents "obtain/maintain safe and stable housing suitable for the children." In the report, DSS "ask[ed] the [trial] court to order [Respondents] to disclose the address where they reside today[,]" and "any time they change residences." In the 27 July 2018 disposition order, the trial court considered DSS's report, and found as fact that Respondents had reported having issues with housing, had provided a false address to DSS, and had "refuse[d] to disclose their physical address to [DSS]." The trial court then ordered "[t]hat [Respondents] shall

provide [DSS] with their address[,]" and that they both "[o]btain and maintain safe and stable housing."

We hold, considering Respondents were actively attempting to keep their place of residence hidden from DSS, and appeared to have moved multiple times in a relatively short time period, that the trial court's order requiring Respondents to obtain and maintain safe and stable housing, and keep DSS informed of any changes in housing, was a reasonable requirement and did not constitute an abuse of discretion. *See A.R.*, 227 N.C. App. at 522, 742 S.E.2d at 633 ("[p]roviding copies of deeds or leases, of employment or income, and notifying [DSS] of any changes in circumstances is also a reasonable requirement upon respondents as it is a manner in which both [DSS] can stay in contact with respondents and ensure that they are making progress toward having their children returned home").

> [P]arental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B–1111(a)(2) even when there is no direct and immediate relationship between the conditions addressed in the case plan and the circumstances that led to the initial governmental intervention into the family's life, as long as the objectives sought to be achieved by the case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's removal from the parental home. The adoption of a contrary approach would amount to turning a blind eye to the practical reality that a child's removal from the parental home is rarely the result of a single, specific incident and is, instead, typically caused by the confluence of multiple factors, some of which are immediately apparent and some of which only become apparent in light of further investigation.

*B.O.A.*, __ N.C. at __, 831 S.E.2d at 313–14. If the trial court can rely on such a case plan as the basis for terminating parental rights pursuant to N.C.G.S. § 7B–1111, the trial court can surely adopt such a case plan, one with "no direct and immediate relationship between the conditions addressed in the case plan and the circumstances that led to the initial governmental intervention into the family's life," *id.*, pursuant to N.C.G.S. § 7B-904(d1)(3), in its disposition order. "We do not, of course, wish to be understood as holding that a trial judge's authority to adopt a case plan pursuant to N.C.G.S. § 7B-904(d1)(3) is unlimited[.]" *Id.* at __, 831 S.E.2d at 314.

## IV. Visitation

Finally, Respondents contend that the trial court erred in failing to set an appropriate visitation schedule. "This Court reviews the trial court's dispositional orders of visitation for an abuse of discretion." *C.M.*, 183 N.C. App. at 215, 644 S.E.2d at 595. "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *A.R.*, 227 N.C. App. at 520-21, 742 S.E.2d at 632 (quotation marks and citation omitted).

In the present case, the trial court's dispositional and permanency planning order provided "[t]hat the parents shall have one visit each month supervised at [DSS] with their respective children. Contact between [Respondent-Father] and [F.C.] shall be recommended by [F.C.'s] therapist." Respondent-Father contends that,

in the latter provision, the trial court erroneously delegated its judicial function of setting visitation between Respondent-Father and F.C. by giving that power to F.C.'s therapist. In support of his argument, Respondent-Father cites to decisions by this Court recognizing that the "'judicial function [of awarding visitation] may [not] be . . . delegated by the court to the custodian of the child.'" *In re J.D.R.*, 239 N.C. App. 63, 75, 768 S.E.2d 172, 180 (2015) (quoting *In re Stancil*, 10 N.C. App. 545, 552, 179 S.E.2d 844, 849 (1971)); *see also In re C.S.L.B.*, __ N.C. App. __, 803 S.E.2d 429, 2017 WL 3027615 (2017).[5] However, in those cited decisions, this Court determined the trial court erred by establishing baseline visitation plans that could be modified at the discretion of the children's guardian. By contrast, the trial court in this case awarded no visitation with F.C. Nor was any visitation required. N.C.G.S. § 7B-905.1 only requires the setting of a visitation plan between a child and his or her "parent, guardian, or custodian[.]" N.C.G.S. § 7B-905.1(a) (2017). Respondent-Father had none of those relationships with F.C. Thus, the trial court was not required, by statute or by decision of this Court, to provide for any visitation between Respondent-Father and F.C., and it did not err when it declined to award any visitation.

While the trial court denied Respondent-Father scheduled visitation with F.C., it did allow "contact" between Respondent-Father and F.C. if recommended by F.C.'s

---

[5] This case was published by order of this Court on 31 July 2017. However, it appears only in unpublished table format in the Southeastern Reporter.

therapist. This decision was supported by the trial court's finding that F.C.'s therapist noted F.C. was exhibiting significant signs of trauma after the initiation of supervised visitation with Respondent-Father, which resulted in the cessation of visitation. Respondent-Father fails to show the trial court abused its discretion in setting this condition for contact between Respondent-Father and F.C.

Respondent-Mother contends that the trial court abused its discretion by only allowing her to visit with her children once per month. She claims such infrequent visitation frustrates efforts toward the permanent plan of reunification with the children. Similarly, Respondent-Father contends that, as to his visits with A.G. and S.G., this Court must remand for a new visitation plan because the trial court "failed to justify why such limited contact with the parents was appropriate."

Neither Respondent cites to any legal authority that would support their contentions that ordering visitation to occur only once per month constitutes an abuse of discretion. Our case law reflects that this frequency of visitation is not unique. *See, e.g., In re N.B.*, 240 N.C. App. 353, 364, 771 S.E.2d 562, 569 (2015) (trial court awarded "at least one visitation session per month for a minimum of one hour"); *In re J.H.*, 244 N.C. App. 255, 277, 780 S.E.2d 228, 243 (2015) (trial court awarded "monthly visitation"). Furthermore, in making their contentions, Respondents do not challenge the trial court's finding that

> [s]ince th[e] date [of the 20 February 2018 adjudicatory hearing], [Respondents] have attended visitation the following dates: 3/7/18, 3/29/18, 4/11/18, and 4/25/18.

> [Respondents] have missed the following visits: 2/21/18, 2/28/18, 3/14/18, 3/21/18, 3/28/18, 4/4/18, 4/18/18, 5/2/18, 5/9/18, 5/16/18, 5/23/18, 5/30/18. Several of these visits were no call/no show. On 5/30/18 [DSS] sent notice to [Respondents] stating that they must schedule a meeting with [DSS] prior to any further visits being scheduled. This notice was sent due to the amount of no call/no show visits. [Respondents] have not attempted to schedule a meeting with [DSS] and have not visited with the children since 4/25/18.

In light of the frequent missed visits by Respondents and the fact that many of the missed visits were not cancelled ahead of time, the trial court did not abuse its discretion in determining that it was in the children's best interests to only have visits with Respondents once per month.

Both Respondents also contend that the trial court abused its discretion in failing to set a minimum time period for the length of their monthly visitations. DSS and the GAL concede this point, and we agree. While the trial court's order establishing monthly visitation sets a minimum frequency of visits, the order does not establish the length of these visits, as required by N.C.G.S. § 7B-905.1(c). *See In re J.H.*, 244 N.C. App. at 277, 780 S.E.2d at 243 (directing the trial court to comply with the requirements of N.C.G.S. § 7B-905.1 on remand where "[t]he order fails to establish the duration of respondent-mother's monthly visitation"). We vacate this part of the 27 July 2018 order and remand. On remand, the trial court shall comply with N.C.G.S. § 7B-905.1(c) by setting a minimum duration of Respondents' visitation.

V. Conclusion

We affirm the trial court's adjudication order. We vacate and remand part of the disposition order for entry of an appropriate order of visitation. We affirm the remainder of the trial court's dispositional order.

AFFIRMED IN PART; VACATED IN PART AND REMANDED.

Judges MURPHY and COLLINS concur.