IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-800

Filed: 16 June 2020

Durham County, Nos. 18 J 114-15

IN THE MATTER OF K.L., J.A. II

Appeal by Respondents from order entered 29 April 2019 by Judge Shamieka

L. Rhinehart in Durham County District Court. Heard in the Court of Appeals 27

May 2020.

*Senior Assistant County Attorney Elizabeth Kennedy-Gurnee for Petitioner-Appellee Durham County Department of Social Services.*

*Garron T. Michael for Respondent-Appellant Mother.*

*David A. Perez for Respondent-Appellant Father.*

*Christopher J. Waivers for Guardian Ad Litem.*

BROOK, Judge.

Respondent-Mother and Respondent-Father (collectively "Respondents") appeal from an order adjudicating their son Joseph abused and neglected and Respondent-Mother's son Kenneth neglected.[1] On appeal, Respondents argue that

---

[1] "Joseph" and "Kenneth" are pseudonyms used by the parties to refer to the juveniles in this case.

the trial court erred in adjudicating Joseph abused and neglected and Kenneth neglected. After careful review, we reverse the order of the trial court.

## I. Background

## A. Factual Background

Early in the morning on 29 May 2018, around 1:00 a.m., Respondent-Mother woke up to feed three-month-old Joseph and afterward started to bounce him as she usually did after a feeding. However, she noticed that Joseph was not putting weight on his left leg. Respondent-Mother then woke Respondent-Father to tell him that Joseph was "not jumping like he usually does." Joseph was not crying, nor did he appear to be in any distress, so Respondent-Father suggested that they wait and see how Joseph was feeling in the morning. When Joseph woke up at 5:00 a.m., he "didn't seem to be in any pain," but he still was not jumping when he was held up. Respondent-Mother dropped Joseph off at the babysitter and checked in with the babysitter regularly to see how Joseph was doing. The babysitter reported that Joseph appeared to be fine, but Respondent-Mother was still concerned, so she scheduled an appointment with his pediatrician for the following day, 30 May 2018.

The pediatrician examined Joseph and said that his leg looked "normal to her" and that "babies sometimes change their habits." Respondent-Mother asked the pediatrician if "she was sure," and the pediatrician told Respondent-Mother that she could order an X-ray if Respondent-Mother was still concerned. Respondent-Mother

asked for the X-ray but did not receive the results until she arrived home with Joseph. The pediatrician called Respondent-Mother and told her that fractures had been identified on Joseph's legs and that she needed to take Joseph to the emergency room at the University of North Carolina hospital. Respondent-Mother went to Duke University Medical Center since it was closer. She called Respondent-Father on the way and told him what the X-rays had revealed and that she did not know how the fractures could have happened. Respondent-Father told her that two days prior, on 28 May 2018, he had placed Joseph on the couch, and, when he turned around, Joseph had fallen about two feet onto carpeted floor.

When Respondent-Mother arrived at Duke Emergency Center, she told the intake nurses what Respondent-Father had told her and gave them a letter from the diagnostic center that had taken the X-rays. The letter read that the center had identified fractures on Joseph's leg and that "non-accidental trauma should not be excluded." At the hospital, four classic metaphyseal lesion fractures were identified on Joseph's left and right legs, and, according to the doctors, these types of fractures were "highly concerning for non-accidental trauma or child abuse." Furthermore, they were not consistent with injuries from the short fall off the couch that Respondent-Father had reported but rather with force generated by "traction, torsion and/or shearing of the leg." After doctors at Duke read the X-rays, they admitted Joseph and decided to call child protective services.

Joseph was discharged from Duke Hospital on 1 June 2018 and placed in a kinship placement with his paternal grandparents. On 4 June 2018, DSS filed a juvenile petition alleging abuse as to Joseph and neglect as to eight-year-old Kenneth, Respondent-Mother's son from a previous relationship who lived with Respondents.

B. Adjudication and Disposition

The adjudication hearing began on 18 December 2018 with Judge Rhinehart presiding. Dr. Deanna Adkins testified first for DSS as an expert in pediatric endocrinology and offered testimony as to her treatment of Joseph during his hospital stay. Dr. Adkins testified that she had performed an evaluation on Joseph on 30 May 2018 to identify whether Joseph had a bone disorder known as rickets because tests revealed that Joseph was vitamin D deficient with corresponding elevated parathyroid hormone ("PTH") levels.[2] Despite initially believing that Joseph had rickets in his left rib, Dr. Adkins testified that Joseph did not exhibit signs of rickets. Dr. Adkins further testified that vitamin D deficiency is common in infants like Joseph who are exclusively breastfed.

Next, Dr. Gary Schooler, the pediatric radiologist who interpreted Joseph's X-rays, testified that six fractures were identified on Joseph—two were not visible on

---

[2] Dr. Adkins testified that rickets is "a bone mineral problem" of which there are multiple types. She further testified that in Joseph's case, doctors evaluated him for "vitamin D deficiency rickets . . . where bone is formed without being calcified at the growth plate. And so the growth plate's widened and that area is not as hard as the other parts of the bone because there is not the calcium in it."

the initial X-rays—but all were healing by the time of Joseph's follow-up visit on 18 June 2018. Dr. Schooler testified that Joseph would not have had the ability to generate the force to create his injuries on his own. Dr. Schooler also testified that, at the time he interpreted Joseph's X-rays, he was not aware that Joseph had vitamin D deficiency or PTH issues.

Dr. Lindsey Terrell, who worked at the Duke Child Abuse and Neglect Medical Evaluation Clinic ("CANMEC"), then testified. Dr. Terrell performed medical examinations of Joseph on 31 May 2018, 1 June 2018, and 18 June 2018. Dr. Terrell collected a complete patient history from Respondents—questioning them together and separately—to try to determine the source of Joseph's injuries. Dr. Terrell testified that Respondents were cooperative, answered her questions, and provided the information that she requested. Dr. Terrell also testified that she spoke with Joseph's primary care provider at Chapel Hill Pediatrics, and the providers at the practice told her they had seen Joseph for his newborn, two-week, one-month, and two-month wellness checks and they had no concerns about him or his family.

Dr. Terrell testified that when a child under the age of one has a fracture, it is recommended that their whole body be assessed and their brain, skull, organs, bones, and eyes be examined for other injuries. Dr. Terrell testified that those tests were ordered, and there were no abnormal findings—save for the fractures in Joseph's legs. Dr. Terrell also testified that Respondent-Mother asked that Joseph be tested for

osteogenesis imperfecta ("OI"), another form of rickets, because OI ran in her family, and Respondent-Mother reported that she had sustained a fracture when she was ten or twelve merely from walking. The test was performed and ultimately came back negative.

Dr. Terrell testified that in her opinion Joseph's injuries were acute and based on the history provided by the parents, most likely occurred on or around 28 May 2018. Moreover, "it was very concerning to" her that "despite multiple times in trying to obtain a history [from Respondents] there was no history provided that could explain the six fractures found in [Joseph]'s legs." Without an explanation or an account for the force she indicated was likely necessary to cause the injuries, Dr. Terrell opined that it was "highly probable" that Joseph had experienced some type of physical abuse.

Durham DSS social worker Shekinah Taylor testified last for DSS. Social Worker Taylor testified that she was assigned to Joseph and Kenneth's case on 31 May 2018 and that as part of her investigation she spoke with the doctors at the CANMEC clinic. As DSS had interviewed Respondents and Kenneth the evening Joseph had been admitted to the hospital, they were not formally interviewed again regarding Joseph's injuries. Social Worker Taylor testified that her role at that time was to complete a safety plan with Respondents regarding Joseph and Kenneth, and, once that was done, she transferred the case to another social worker on either 1 or 4

June 2018. Social Worker Taylor also testified that no bruises, markings, or indications of abuse or injury were ever found on Kenneth. She further testified that DSS had concerns for an injurious environment due to Kenneth's living in the home where Joseph's injuries "potentially occurred[,]" which resulted in the juvenile petition alleging Kenneth to be a neglected juvenile.

Respondents then testified. Both Respondent-Father and Respondent-Mother testified that they did not know how Joseph sustained his injuries. Respondent-Mother testified that not knowing what caused Joseph's fractures "bothers me because if something's wrong with him I definitely[] . . . want to know . . . if it's, you know a bone disease or something." Respondent-Father testified that criminal child abuse charges were never brought against him or Respondent-Mother.

Following the presentation of all evidence, the trial court announced its judgment in court on 20 December 2018, adjudicating Joseph abused and Kenneth neglected.

The matter then proceeded to the disposition stage.

Social Worker Taylor testified first that she did not have any concerns regarding Respondents' ability to maintain stable housing or employment. Social Worker Brianna Dearing, who was then assigned to the case, testified that Respondents had fully complied with DSS's recommendations and been "very cooperative." Social Worker Dearing testified that she had spoken with Kenneth

several times since being assigned to the case and Kenneth told her that "he doesn't like the fact that his brother doesn't live in the home[,]" that he loved Respondent-Father, and wanted to live with his mom, Respondent-Mother. Social Worker Dearing also testified that Respondents visited Joseph daily, driving an hour and a half each way to visit Joseph at his grandparents' home.

Guardian Ad Litem ("GAL") Susan Fisher then testified about her investigation regarding Joseph and Kenneth. She testified that she had no concerns regarding Respondents' interactions with both Joseph and Kenneth and that the two children appeared to be very bonded to Respondents. GAL Fisher also testified that she had spoken with Respondent-Father's ex-wife of ten years, with whom he had three children, who reported that Respondent-Father "wouldn't hurt a fly" and that she had "no concerns at all that he did anything to injure [Joseph]." Finally, GAL Fisher testified that, contrary to what she wrote in her court summary, she did not "feel that there is a danger for the children to be in [Respondents'] home."

On 21 December 2018, the trial court determined that it would be in Kenneth's best interest to remain in Respondents' home but in Joseph's best interest to remain in the legal custody of DSS and in a kinship placement with his paternal grandparents.

The trial court's written order was entered on 29 April 2019, adjudicating Joseph abused and neglected and Kenneth neglected and including findings of fact and conclusions of law for disposition.

Respondents timely appealed.

## II. Analysis

On appeal, Respondents argue that the trial court erred in adjudicating Joseph abused based only on unexplained injuries. Respondents further argue that the trial court lacked subject matter jurisdiction to adjudicate Joseph neglected because DSS failed to properly allege neglect in the original juvenile petition, and the allegations pertaining to abuse were insufficient to put Respondents on notice that neglect was at issue. Finally, Respondents argue that the trial court erred by adjudicating Kenneth neglected solely on the basis of unexplained injuries sustained by his half-brother.

We consider Respondents' arguments in turn.[3]

## A. Standard of Review

We review an adjudication under N.C. Gen. Stat. § 7B-807 (2019) to determine whether the trial court's findings of fact are supported by "clear and convincing competent evidence" and whether the court's findings support its conclusions of law.

---

[3] Respondent-Mother and Respondent-Father filed separate briefs, but many of their arguments on appeal are similar so we consider them together. We have noted where their arguments differ throughout this opinion.

- 9 -

*In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). The "clear and convincing" standard "is greater than the preponderance of the evidence standard required in most civil cases." *In re Smith*, 146 N.C. App. 302, 304, 552 S.E.2d 184, 186 (2001) (citation and marks omitted). Clear and convincing evidence is "evidence which should fully convince." *Id.* (citation and marks omitted). Findings of fact unchallenged by the appellant are "binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). Labels are not dispositive in our review of a lower court's factual findings and conclusions of law. *See State v. Sparks*, 362 N.C. 181, 185, 657 S.E.2d 655, 658 (2008) ("[F]indings of fact which are essentially conclusions of law will be treated as such on appeal.") (internal marks and citation omitted).

Whether a child is abused or neglected is a conclusion of law, *In re Ellis*, 135 N.C. App. 338, 340, 520 S.E.2d 118, 120 (1999), and we review a trial court's conclusions of law de novo, *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006). We also review the question of whether the trial court had subject matter jurisdiction over the action de novo. *In re J.A.P.*, 189 N.C. App. 683, 685, 659 S.E.2d 14, 16 (2008). Under a de novo review, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *In re A.K.D.*, 227 N.C. App. 58, 60, 745 S.E.2d 7, 8 (2013) (citation omitted).

B. Adjudication of Joseph as Abused

Respondents first argue that the trial court erred in adjudicating Joseph abused. We agree.

### i. Findings of Fact Regarding Abuse

Respondents argue that the trial court erred in adjudicating Joseph abused because several of the trial court's findings of fact are not supported by clear and convincing evidence. Respondents both challenge findings of fact 28 and 42, Respondent-Father challenges findings 17 and 18, and Respondent-Mother further challenges finding 23.

These challenged findings (or pertinent portions thereof) state:

> 17. . . . The mother reported that [Joseph] had been in her or his father's exclusive care from the evening of May 24, 2018 until the morning of May 29, 2018. . . .

> 18. . . . The child was not with the sitter during the evening of May 24, 2018 through the morning of May 29, 2018. . . .

> . . .

> 23. While providing history to Dr. Terrell, Father describes several times that Mother was in the kitchen and came right into the living room after [Joseph] reportedly fell from the couch. . . .

> . . .

> 28. According to Dr. Adkins, [Joseph]'s Vitamin D deficiency is consistent with a diagnosis of Vitamin D deficiency without evidence of Rickets. At trial, Dr. Adkins confirmed that [Joseph] does not have evidence of Rickets. [Joseph]'s evaluated [sic] PTH and parathyroid hormone

are explained by his low Vitamin D level. According to Dr. Adkins, [Joseph]'s Calcium and Phosphorous are normal. Dr. Adkins opined that [Joseph]'s metaphyseal fractures are likely not related to his Vitamin D level and his long bones are not at increased risk of fractures.

. . .

42. The Court finds that these (6) fractures occurred when [Joseph] was in the sole care of his two parents on May 28, 2018 and that these injuries were not from a fall. [Joseph] suffered non-accidental trauma based on all the medical documentation.

As to findings 17 and 18, Respondent-Father argues that the evidence shows Joseph was not in Respondents' exclusive care from 24 May 2018 to the morning of 29 May 2018, but rather clear and convincing evidence established that Joseph was with the babysitter on 25 May 2018 and was held by family members on 26 and 27 May 2018. We agree with Respondent-Father. The record demonstrates that Joseph was in the care of his babysitter for portions of 24 and 25 May 2018. Further, while Respondent-Mother testified that she and Respondent-Father were watching Joseph the whole weekend, she also noted that Joseph was held by family members at several family events on the weekend of 26 to 27 May 2018. Accordingly, we hold that both findings 17 and 18 are not supported by clear and convincing evidence insomuch as Joseph was not in Respondents' exclusive care from 24 May 2018 to 27 May 2018, and we are not bound by that portion of either finding.

Respondent-Mother next challenges finding 23, arguing Respondent-Father told Dr. Terrell that Respondent-Mother was in the kitchen *or* came into the living room after Joseph's fall from the couch. Though Respondent-Mother is correct, we hold that any error here is immaterial given that the record establishes the salient point: Respondent-Mother was not in the room when Joseph fell from the couch.

As to finding of fact 28, Respondents challenge this portion of that finding: "According to Dr. Adkins, [Joseph]'s Vitamin D deficiency is consistent with a diagnosis of Vitamin D deficiency without evidence of Rickets." Though she did not use these exact words, Dr. Adkins did testify that Joseph did not have rickets, but he was Vitamin D deficient. This finding thus is a fair summation of Dr. Adkins's testimony.

Finally, Respondents argue that finding of fact 42 is not supported by clear and convincing evidence in finding that Joseph was in the sole care of his parents when injured on 28 May 2018 and that he suffered "non-accidental trauma." We agree in part. Dr. Terrell testified that in her opinion, it was "highly probable" Joseph's injuries were caused by non-accidental trauma and not a fall from the couch. Dr. Terrell also testified Joseph's injuries occurred around when he became symptomatic, which was "on or around 28 May 2018[,]" not *on* 28 May 2018. Accordingly, clear and convincing evidence supports that Joseph suffered non-accidental trauma that was not from a fall. But there is no clear and convincing evidence that the fractures

occurred when Joseph was in the sole care of his parents on 28 May 2018, and, thus, we are not bound by that portion of finding 42.

## ii. Conclusion of Law Regarding Abuse

Respondents next argue that the trial court erred as a matter of law by adjudicating Joseph abused where there was no evidence—aside from Joseph's unexplained injuries—to support the trial court's conclusion.

An abused juvenile is defined, in pertinent part, as one whose parent, guardian, custodian, or caretaker "[i]nflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means[.]"  N.C. Gen. Stat. § 7B-101(1) (2019).  "This Court has previously upheld adjudications of abuse where a child sustains non-accidental injuries, even where the injuries were unexplained[,]" where clear and convincing evidence supported the inference that the respondent-parents inflicted the child's injuries or allowed them to be inflicted.  *In re J.M.*, 255 N.C. App. 483, 495, 804 S.E.2d 830, 838-39 (2017).  While "the determinative factors [in a neglect proceeding] are the circumstances and conditions surrounding the child, not the fault or culpability of the parent[,]" *In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984), the same is not true in an abuse proceeding, *see* N.C. Gen. Stat. § 7B-101(1) (defining an "abused juvenile" as one "whose parent, guardian, custodian, or caretaker:  (a) [*i*]*nflicts or allows to be inflicted . . .* (b) *creates or allows to be created . . .* (c) *uses or allows to be used . . .*") (emphasis added).

For example, in *In re R.S.*, 254 N.C. App. 678, 683, 802 S.E.2d 169, 172 (2017), this Court upheld the trial court's abuse adjudication where, in addition to the infant's "serious, yet unexplained injuries," the infant was diagnosed with failure to thrive (weighing less than he did at birth), and a skeletal survey revealed prior, healing fractures on the infant. Testimony established that the infant's injuries "would have resulted in a significant amount of bleeding" such that it was "not credible" that the respondent-parents claimed not to have observed any bleeding or pain associated with the injury. *Id.* at 681, 802 S.E.2d at 171. We held that "the trial court's finding that the parents were responsible for those injuries was entirely appropriate." *Id.* at 683, 802 S.E.2d at 172.

And in *In re C.M.*, 198 N.C. App. 53, 678 S.E.2d 794 (2009), this Court affirmed an abuse adjudication where the child suffered from an unexplained subdural hematoma and further examination revealed bruises and marks on his back and chin. *Id.* at 58, 678 S.E.2d at 797. Additionally, witness testimony established the respondent-father had hit the child on the head earlier that day, and there were also confirmed instances of domestic violence in the home. *Id.* at 62, 678 S.E.2d at 799.

In *In re J.M.*, we again affirmed an abuse adjudication where a two-month-old was observed with "marks" on his neck. 255 N.C. App. at 485, 804 S.E.2d at 832. A subsequent skeletal survey revealed "healing fractures to his ribs, tibia, and fibula; ear and tongue bruising; subconjunctival hemorrhages; and excoriation under the

chin." *Id.* The mother also revealed to DSS that the respondent-father had punched the son in the stomach, excessively disciplined the daughter, engaged in domestic violence in front of the children, and smoked marijuana in the presence of the children. *Id.* Though the exact cause and manner of the infant's injuries were unknown, "[t]he binding findings of fact establish[ed] that the son sustained multiple non-accidental injuries and [the r]espondent-[f]ather was responsible for the injuries." *Id.* at 495, 804 S.E.2d at 838.

In each of these cases, though the exact cause of the child's injury was unclear, the trial court's findings of fact—or other evidence in the record—supported the inference that the respondent-parents were responsible for the unexplained injury. While "[t]he caselaw does not require a pattern of abuse or the presence of risk factors[,]" we do require clear and convincing evidence to support this inference. *In re L.Z.A.*, 249 N.C. App. 628, 637, 792 S.E.2d 160, 168 (2016) (affirming abuse adjudication where the infant sustained an unexplained bilateral midline shift, brain bleeding, and a skull fracture, the infant's skeletal survey revealed a one- to three-week-old healing fracture on her upper arm, and there was a delay in seeking medical treatment for the child). Such evidence can serve as the basis for findings of fact that, in turn, sufficiently support the conclusion that the respondent-parents inflicted or allowed the infliction of the injury at issue.

Here, the trial court's binding findings of fact established that

10. On or about May 30, 2018, After Hours Durham DSS CPS Social Worker Courtney Munroe ("Social Worker Munroe") conducted a hospital visit to initiate an assessment/CPS investigation in reference to [Joseph] and the family. Social Worker Munroe spoke with the mother, [], and observed the child, [Joseph]. [Respondent-Mother] stated she did not know how the child's leg was fractured. [Respondent-Mother] stated she had noticed that the child was not putting any pressure on his leg and took him to his pediatrician where it was confirmed that [Joseph] had a fracture in his left leg. The pediatrician recommended that the mother take the child to the UNC ED for further evaluation. However, the mother took him to DUMC immediately due to the closer proximity of DUMC. The medical providers at DUMC ED reported that the explanation given by the respondent parents was inconsistent with the injuries [Joseph] sustained. Due to concern for nonaccidental trauma, CANMEC was consulted.

11. . . . That same evening on May 30, 2018, Social Worker Munroe interviewed [Respondent-Father] at the family home . . . . Social Worker Munroe spoke with [Respondent-Father] who stated that . . . the child, [Joseph], rolled off the couch and fell to the floor; but he appeared fine afterwards. [Respondent-Father] reported that no family members were present in the room when [Joseph] rolled off the couch. . . . [Respondent-Father] also stated that he did not actually see the child roll off the couch but found him on the floor after placing [Joseph] on the couch. Social Worker Munroe observed that the couch was about 18 inches high and there was carpeted floor underneath it.

12. Social Worker Munroe also interviewed the minor child [Kenneth] (8 years old) who stated he did not see his baby brother fall nor did he know how he was hurt. Social Worker Munroe asked [Kenneth] how [Respondent-Father] disciplined him. [Kenneth] responded that [Respondent-Father] talks to him and tells him what to do

IN RE K.L. AND J.A. II

or sometimes makes him write sentences. [Kenneth] denied that [Respondent-Father] ever hit him. Social Worker Munroe also asked [Kenneth] how his mother disciplined him. [Kenneth] stated that his mother takes his phone away or does not allow him to play games or watch TV. [Kenneth] also reported that he was happy at his mother's home. Social Worker Munroe did not observe any bruises, marks, or physical injuries to [Kenneth]. . . .

13. Durham DSS CPS Social Worker Shekinah Taylor was immediately assigned this case. On May 31, 2018, Social Worker Taylor contacted the family and requested a child and family team ("CFT") meeting to be held on June 1, 2019 [sic] to further discuss the CPS case and to develop a plan with the family for the children. [Respondent-Father] and [Respondent-Mother] attended the CFT and discuss [sic] planning for the children [Joseph and Kenneth]. Both [Respondent-Mother] and [Respondent-Father] have been forthcoming with the investigation and asking questions with hopes of finding out what could have caused these injuries in their son, [Joseph]. Durham DSS expressed their concerns for the safety of the children, especially [Joseph] who suffered metaphyseal fractures. . . .

. . .

17. . . . The mother reported to physician at DUMC ED that after noticing a change in [Joseph]'s behavior in the early morning of May 29, 2019 [sic], the mother took the child to his pediatrician at Chapel Hill Pediatrics on May 30, 2019 [sic]. During the CPS investigation, the mother shared that she asked [Joseph]'s father what happened, and he had provided the same account, that the child rolled off the couch and hit the floor. According to the father, the child did not cry after falling off the couch. Therefore, he thought that the child was okay. The mother also stated that she was upstairs with her (8-year-old son) [Kenneth] when [Joseph] fell off the couch.

18. On or about May 30, 2018, the mother also informed the DUMC ED doctor [] that other than [Joseph]'s left leg, he appeared completely normal and that she almost did not take him to the doctor. However, the mother did take him to the doctor because she concerned. The mother mentioned that the child started going to a sitter (Shonda Collins, a family friend of over 40 years) when the mother went back to work about a week ago. The child was with the sitter . . . on May 29, 2018 and again on May 30, 2018 for a few hours in the daytime. The mother stated that she called the sitter on May 29, 2018 and on May 30, 2018 to check on [Joseph]'s movement on his left leg. The mother reported that the sitter did not notice any issues with [Joseph]. The mother reported that she was concerned about [Joseph]'s leg, so she scheduled a doctor appointment for May 30, 2018 with his pediatrician at Chapel Hill Pediatrics.

19. At DUMC ED, additional x-rays were performed on [Joseph] as protocol. There were no visual [sic] bruises or marks on [Joseph]'s body when he presented at the ED on May 30, 2018. That same night (May 30, 2018), [Joseph] was seen by several physicians[.] . . .

20. [Joseph] is a previously healthy three months [sic] old male who was referred for consultation by Dr. Bordley of Pediatric ED Service for evaluation of broken bones. Due to concern for possible maltreatment the following testing was recommended: a skeletal survey, dilated eye exam, head CT, screening abdominal injury labs (AST/ALT/Lipase), as well as labs to assess bone health (Vitamin D, PTH, Ca, Phos, Alk Phos). . . .

21. On May 31, 2018, Dr. Terrell introduced herself to [Respondent-Mother] as a Pediatrician on Duke Hospital's Child Abuse Consult Team. Dr. Terrell explained that Pediatric ED and Trauma Surgery Teams requested her consult to help assess [Joseph] given the injuries. Dr. Terrell explained that she provides medical evaluations regarding injury etiology. The Mother

verbalized understanding and agreement and agreed to the evaluation. During the medical evaluation, the mother provided additional information to Dr. Terrell. Mother explained that their car was rear-ended in April 2018. Mother reported that [Joseph] was strapped in the car seat and the car seat was strapped in the car. . . . Mother called [Joseph]'s doctor after the accident. Mother reported that [Joseph] seemed fine; therefore, the doctor did not think that the child, [Joseph] needed to come in. Mother asked Dr. Terrell if [Joseph]'s fractures could have come from changing diapers. Dr. Terrell informed the mother that changing diapers would not cause these fractures. Dr. Terrell also stated that the automobile accident that the mother described was too long ago in time to be considered the cause of [Joseph]'s fractures. It would take significant force to cause this type of fracture with a closer time proximity. . . .

. . .

25. When asked about any risk factors and exposures to domestic violence in the home [by Dr. Terrell], the mother reported that [Joseph] has not witnessed domestic violence ("DV") first hand between caregivers or family members. Mother was asked with the father out of the room if there have been concern [sic] of DV or if she ever worries about her safety. Mother denied. Mother has previous marijuana use. [Joseph]'s meconium was positive for marijuana at birth. There is a history of mental illness involving family member(s) or caregiver(s). There is no history of criminal arrest or legal charges against family member(s) or caregiver(s). Dr. Terrell also reviewed family medical history with the mother and father and there was no significant medical history. Dr. Terrell also reviewed all the available lab work and noted that the dilated eye exam, head CT, screening abdominal injury labs (AST/ALT/Lipase) were within normal limits.

26. . . . According to [Respondent-Mother]'s pregnancy/birth history for [Joseph], [Joseph]'s fetal

movement and amniotic fluid volume were normal. Ultrasound examination during the pregnancy were normal. The mother took the following medications during pregnancy[:] Zoloft, Klonopin, Trazodone with a history of anxiety and depression. The mother was smoking marijuana every day before she found out about the pregnancy (first trimester). At birth, [Joseph]'s meconium drug screen was positive for marijuana ("THC"). [Joseph] was born at full-term (40 weeks and 3 days) by repeat C-section. According to medical records, labor was uncomplicated. There were perinatal issues of concern of withdrawal in view of the mother's drug use of THC. [Joseph] had a stuffy nose after delivery, but this resolved after 2 days. [Joseph] was discharged home with his mother at 3 days old.

. . .

29. On May 31, 2018, Dr. Gary Schooler, Pediatrics Radiologist, was also consulted regarding [Joseph]'s injuries. Dr. Schooler reviewed multiple prior left lower extremity x-rays (radiographs) completed on [Joseph] while at DUMC. Dr. Schooler also reviewed [Joseph]'s standard skeletal survey of a total of 20 images. There were no fractures identified with the calvarium (skull), visualized facial bones or spine and there was no evidence of static listhesis (joint instability); however, Dr. Schooler noted that there was a metaphyseal corner fracture (classic metaphyseal lesion) to [Joseph]'s right leg, highly suggestive of nonaccidental trauma. Findings and impressions regarding the right proximal tibial metaphyseal fracture were discussed with Dr. Terrell in the late evening of May 31, 2018. [Joseph] was found to have three metaphyseal corner fractures which are known as "classic metaphyseal lesions." . . .

. . .

37. On June 28, 2018, [Joseph] had genetic labs drawn. [Joseph]'s genetic labs were not different from his

last genetic lab results from admission to DUMC from May 31, 2018 through June 1, 2018. The genetic/metabolic test results remain the same: negative for bone disorder. According to the Pediatric Endocrinology Team, [Joseph]'s Vitamin D insufficiency did not contribute to his multiple fractures and does not contradict the diagnosis of child abuse.

38. Based on the history provided by the parents, medical examinations, genetic testing, labs, x-rays, and skeletal surveys, Dr. Schooler, Dr. Terrell and Dr. Adkins agree along with other physicians consulted in this case that [Joseph]'s fractures are highly suspect for nonaccidental trauma.

39. The Court gives great weight to the fact that the parents could not provide history that could explain the six (6) fractures that [Joseph] sustained. The Court is concerned that the types of fractures that [Joseph] sustained were the kinds that are created by twisting, pulling, shearing, or torsion. It takes a significant amount of force to create the types of fractures that [Joseph] endured.

40. According to Dr. Terrell and the testimony the Court heard, May 28, 2018 was the day that [Joseph] became symptomatic. At the time that he became symptomatic or it became evident that he was not placing weight on his left leg, he was in the care of the two persons that are to make sure he is protected which are his mother and father.

. . .

42. The Court finds that these six (6) fractures occurred when [Joseph] was in the sole care of his two parents on May 28, 2018 and that these injuries were not from a fall. [Joseph] suffered non-accidental trauma based on all the medical documentation[.]

Unlike those instances in which this Court has upheld an abuse adjudication based on unexplained injuries, the trial court's detailed findings of fact in this case do not sufficiently support the conclusion that Respondents inflicted or allowed the infliction of Joseph's injuries. Doctors noted in medical records, which were admitted into evidence and fully incorporated into the adjudication order, that Joseph was a healthy, well-cared-for, three-month-old baby. *Cf. In re R.S.*, 254 N.C. App. at 679, 802 S.E.2d at 170 (noting child was "diagnosed with failure to thrive" and weighed less than he did at birth). Both DSS and the doctors noted that Respondents were at all times forthcoming and cooperative in the ongoing investigation and Joseph's medical care and did not delay in seeking prompt medical attention for Joseph. *Cf. id.* at 682, 802 S.E.2d at 172 ("[Respondents] delayed meetings between the social worker and the [older] children, delayed and limited medical tests, and appear to have omitted information."); *cf. In re Y.Y.E.T.*, 205 N.C. App. 120, 122, 695 S.E.2d 517, 519 (2010) (noting two-day delay "in the parents' getting the child to the hospital"). In fact, Joseph's injuries manifested themselves so subtly that they were not noticed by his babysitter and initially escaped notice by his pediatrician and were diagnosed due to Respondent-Mother's persistence in seeking X-rays, which, in turn, revealed fractures in both his symptomatic and asymptomatic leg. And subsequent testing did not reveal any prior injuries, marks, bruising, or medical concerns with Joseph. *Cf. In re J.M.*, 255 N.C. App. at 485, 804 S.E.2d at 832 (skeletal survey

revealed healing fractures to infant's ribs, tibia, fibula; ear and tongue bruising; subconjunctival hemorrhages; and excoriation under the chin). Finally, as noted above, the evidence does not support the finding that Joseph was in Respondents' exclusive care when his injuries occurred. *Cf. In re Y.Y.E.T.*, 205 N.C. App. at 127, 695 S.E.2d at 522 (noting unchallenged findings that the child was in the exclusive care of the respondent-parents at the time of the injuries).

The broader record raises no red flags about the family. There was no ongoing substance abuse nor domestic violence in the home, *cf. In re J.M.*, 255 N.C. App. at 485, 804 S.E.2d at 832, and Respondents had no prior history with DSS, *cf. In re K.B.*, 253 N.C. App. 423, 424-25, 801 S.E.2d 160, 162 (2017). Moreover, Kenneth told DSS that he was unaware of how Joseph was hurt, Respondents never punished him with violence, and he provided examples of appropriate discipline, including by talking with him and taking away his privileges. And neither Kenneth nor Joseph ever exhibited bruises or marks on their bodies.

The trial court was rightly concerned that Respondents were unable to explain Joseph's fractures. But, that alone, as a matter of law, cannot support the trial court's conclusion that Respondents were responsible for Joseph's injuries. There is nothing to bridge the evidentiary gap between the unexplained injuries here and the conclusion that Respondents inflicted them, and, in fact, much of the evidence is in

tension with that conclusion.[4]   We therefore reverse the trial court's order

adjudicating Joseph abused and remand to the trial court for further proceedings

consistent with this opinion.

## C. Adjudication of Joseph as Neglected

Respondents next argue that the trial court erred in adjudicating Joseph

neglected because the petition filed by DSS only alleged abuse.  We agree.

### i. Preservation

We first address DSS's argument that this issue is not preserved for our

review.

"The pleading in an abuse, neglect, or dependency action is the petition[,]" N.C.

Gen. Stat. § 7B-401 (2019), and must contain "allegations of facts sufficient to invoke

---

[4] We do not gainsay the nature of the challenges and concerns DSS faces when dealing with allegations of abuse in pre-mobile infants who are completely dependent on their caregivers and unable to report what has happened to them.  In instances such as these, DSS is charged with taking quick and decisive action to assess and address unexplained trauma.  Nor do we take lightly the risk that parents who are witness to or perpetrators of child abuse or neglect can collaborate to frustrate investigation by DSS.  *See, e.g.*, *In re J.C.M.J.C*, ___ N.C. App. ___, ___, 834 S.E.2d 670, 679 (2019) ("We recognize [r]espondents' actions frustrated CCDHS's ability to gather evidence in this case.").

That being said, a review of the record before us indicates that DSS engaged in only a limited investigation of how Joseph sustained his injuries.  According to Respondents' and Social Worker Taylor's testimony, Respondents were interviewed once by DSS regarding Joseph's injuries:  the night he was admitted to the ER.  (The report on that interview is not a part of our record.)  Kenneth was also only interviewed once about Joseph's injuries, a discussion that, based on the record before us, did not touch on his physical interactions with his little brother.  Neither Joseph's babysitter nor family members who had spent the weekend with him were interviewed.  Instead, the causal link between Respondents and Joseph's injuries was based strictly on medical opinions about the serious nature of the fractures and, relatedly, that they were "highly probable" to have resulted from abuse.  In this instance, given that there is no affirmative evidence in the record giving rise to even an inference that Respondents inflicted or allowed the infliction of a serious injury upon Joseph, these opinions are insufficient to support an abuse adjudication.

jurisdiction over the juvenile[,]" *id.* § 7B-402(a). If the allegations are insufficient to put the party on notice as to which alleged grounds are at issue, then the trial court lacks subject matter jurisdiction over the action. *See In re K.B.*, 253 N.C. App. 423, 427, 801 S.E.2d 160, 163 (2017); *In re D.C.*, 183 N.C. App. 344, 349, 644 S.E.2d 640, 643 (2007). Since it is well established that "a question of jurisdiction may be addressed by this Court at any time, *sua sponte*, regardless of whether [the] parties properly preserved it for appellate review[,]" Respondents' argument is properly before us. *In re C.M.H.*, 187 N.C. App. 807, 808, 653 S.E.2d 929, 930 (2007) (internal marks and citation omitted).

### ii. Merits

Only "those conditions alleged in the juvenile petition" may "be considered, proved, and adjudicated[.]" *In re D.C.*, 183 N.C. App. at 349, 644 S.E.2d at 643. "[I]f the specific factual allegations of the petition are sufficient to put the respondent on notice as to each alleged ground for adjudication, the petition will be adequate." *Id.* at 350, 644 S.E.2d at 643. This is so even if DSS fails to "check the [correct] box" on the petition. *In re K.B.*, 253 N.C. App. at 427, 801 S.E.2d at 163-64.

> While it is certainly the better practice for the petitioner to "check" the appropriate box on the petition for each ground for adjudication, if the specific factual allegations of the petition are sufficient to put the respondent on notice as to each alleged ground for adjudication, the petition will be adequate.

*In re D.C.*, 183 N.C. App. at 350, 644 S.E.2d at 643. However, if the correct box is not checked *and* the factual allegations do not clearly allege the separate claim, then that adjudication must be reversed. *Id.*

In *In re K.B.*, we affirmed the trial court's adjudication of an abused, neglected, and dependent juvenile despite the fact that the petition only explicitly alleged that the child was abused and neglected. 253 N.C. App. at 426, 801 S.E.2d at 163. Though "DSS did not 'check the box' alleging dependency" on the petition, "[t]he allegations attached to the petition [] were sufficient to put respondent-mother on notice that dependency would be at issue during the adjudication hearing" because they "encompass[ed] the language reflected in the statutory definition of dependency[.]" *Id.* at 427-28, 801 S.E.2d at 163-64 (petition alleged specifically "that respondent-mother failed to provide for [the child]'s care or supervision and lacks an appropriate alternative child care arrangement." (internal marks omitted)). Moreover, our Court noted that an order entering stipulations for adjudication stated in the first sentence that the petition alleged abuse, neglect, and dependency. *Id.* at 428, 801 S.E.2d at 164.

On the other hand, in *In re D.C.*, this Court reversed the trial court's neglect adjudication where DSS alleged dependency in its juvenile petition but proceeded on the theory of neglect at adjudication. 183 N.C. App. at 349, 644 S.E.2d at 643. We held that the "specific factual allegations" attached to the petition "were insufficient

to put [the] respondent on notice that both dependency *and neglect* of C.C. would be at issue during the adjudication hearing." *Id.* at 350, 644 S.E.2d at 643 (emphasis in original). The attachment alleged that the respondent: "(1) received sporadic prenatal care for C.C., (2) refused to divulge the identity of C.C.'s father, (3) does not possess a crib, diapers, clothes, or formula for C.C., and (4) is incapable of providing care for a newborn." *Id.* We held that "[t]hese minimal allegations . . . while supporting the claim of dependency, did not clearly allege the separate claim of neglect."[5] *Id.*

Here, the juvenile petition that DSS filed alleged only that Joseph was an abused juvenile. The abuse box on the petition alone was checked and all allegations were found in this section of the form. Further, the petition tracked the language of the abuse statute, alleging "that the juvenile's parent, guardian, custodian, or caretaker: has inflicted or allowed to be inflicted on the juvenile a serious physical

---

[5] Under N.C. Gen. Stat. § 7B-101(15) (2019), a "neglected juvenile" is

> Any juvenile less than 18 years of age . . . (ii) whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or the custody of whom has been unlawfully transferred under G.S. 14-321.2; or who has been placed for care or adoption in violation of law. . . .

Unlike in *In re K.B.*, the factual allegations in *In re D.C.* did not encompass the language in the statutory definition of neglect such that the respondent-parents had no notice that neglect would be at issue in the proceedings.

injury by other than accidental means." The only facts that DSS alleged in support

of the petition were that

> [t]hree month old [Joseph] has two fracture [sic] in the left
> leg and one in the right leg. The mother and father can not
> [sic] explain how the injury occurred. The father stated the
> child fell of the couch, but the doctors state the injuries are
> not consistent with the story.

Not only did DSS fail to "check the box" for "neglect" on the form petition, but,

as in *In re D.C.*, the factual allegations here do not "clearly allege the *separate claim*

of neglect." 183 N.C. App. at 350, 644 S.E.2d at 643 (emphasis added). There is no

reference to "neglect" in the allegations, nor do they encompass language from the

statutory definition of neglect. Additionally, the arguments of counsel for

Respondent-Mother, Respondent-Father, and the Guardian Ad Litem in the

adjudicatory phase of the proceedings focused only on whether DSS had proved by

clear and convincing evidence that Joseph was abused. And when the trial court

orally announced its judgment on 20 December 2018, it adjudicated Joseph abused—

not abused *and neglected*. While the trial court's written order, entered over four

months later, adjudicated Joseph abused and neglected, the record indicates that the

Respondents did not have notice the issue of neglect was before the trial court.

We therefore reverse that portion of the trial court's order adjudicating Joseph

neglected.

D. Adjudication of Kenneth as Neglected

Finally, Respondents argue that the trial court erred in adjudicating Kenneth neglected. We agree.

### i. Findings of Fact Regarding Neglect

Respondents first challenge finding of fact 9 as not supported by clear and convincing evidence. Respondent-Mother separately challenges finding of fact 43. Those findings are:

> 9. The child, [Kenneth], lives in the same home in which the injures occurred with his younger sibling, [Joseph]. [Kenneth] was residing with his mother and mother's live-in boyfriend [Respondent-Father] and younger sibling, [Joseph] . . .

> . . .

> 43. Moreover, the parents continue to endorse that they have no knowledge of what could have caused the six fractures in the infant, [Joseph]. Because of their lack of knowledge, the Court finds that the home of the parents creates an injurious environment to the welfare of [Kenneth] and continuous risk of harm to [Kenneth] at the time. [Kenneth] was living and present in the home when [Joseph] became symptomatic.

As to finding of fact 9, Respondents argue that no clear and convincing evidence established exactly where Joseph's injuries occurred, much less that they occurred in the home. While doctors opined that Joseph's injuries occurred on or about 28 May 2018, the record contains no evidence from witnesses, expert or otherwise, about where Respondents, Kenneth, or Joseph were on 28 May 2018. The only information regarding that day came from Respondent-Mother and Respondent-Father, who told

Dr. Terrell that Joseph rolled off the couch around 6:00 p.m. However, as the expert witnesses repeatedly testified and the trial court ultimately found, Joseph's injuries were not consistent with a fall from the couch, so that evidence cannot support this finding. Given this record, the trial court's finding here is unsupported by the evidence to the extent it indicates that the injury occurred in the family's home.

Respondent-Mother also challenges finding of fact 43. While there is clear and convincing evidence in the record to support the trial court's finding that Respondents "continue to endorse that they have no knowledge of what could have caused the six fractures" in Joseph, the remainder of this finding is properly labeled a conclusion of law, and we consider it as such below.

ii. Conclusion of Law Regarding Neglect

"In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives . . . in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C. Gen. Stat. § 7B-101(15) (2019). "[T]he neglect statute affords the trial judge some discretion in determining the weight to be given [] evidence" of prior abuse or neglect. *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999) (internal marks and citation omitted). "[T]he fact of prior abuse, standing alone," however, "is not sufficient to support an adjudication of neglect." *In re N.G.*, 186 N.C. App. 1, 9, 650 S.E.2d 45, 51 (2007). "Instead, this Court has generally required the presence of other

factors to suggest that the neglect or abuse will be repeated." *In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 487, 489 (2014); *see also In re J.A.M.*, 372 N.C. 1, 10, 822 S.E.2d 693, 699 (2019) (explaining that the trial court's findings must show that the juvenile "presently face[s] substantial risk in [his or] her living environment.").[6]

Other factors that suggest that the neglect or abuse will be repeated include the presence of domestic violence in the home and current and ongoing substance abuse issues, *see In re D.B.J.*, 197 N.C. App. 752, 755-56, 678 S.E.2d 778, 781 (2009) (affirming adjudication of D.B.J. as neglected where "parents engaged in acts of domestic violence in D.B.J.'s presence," the mother "never ceased contact with [the] [r]espondent[,]" and the "[m]other has abused alcohol and/or controlled substances"), unwillingness to engage in recommended services or work with or communicate with DSS regarding the prior abuse or neglect, *see In re N.G.*, 186 N.C. App. 1, 9-10, 650 S.E.2d 45, 51 (2007), *aff'd per curiam*, 362 N.C. 229, 657 S.E.2d 355 (2008) (emphasizing the respondent-parents' unwillingness to work with DSS in prior case in upholding neglect adjudication), and failing to accept responsibility for prior adjudications, *see In re J.A.M.*, 372 N.C. at 7, 822 S.E.2d at 697 (affirming neglect

---

[6] We note that in neglect cases involving newborns, "the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re McLean*, 135 N.C. App. at 396, 521 S.E.2d at 127; *see also In re A.B.*, 179 N.C. App. 605, 611, 635 S.E.2d 11, 16 (2006) ("To hold that a newborn child must be physically placed in the home where another child was abused or neglected would subject the newborn to substantial risk, contrary to the purposes of the statute."). A trial court is not limited to forecasting, however, in instances such as the current controversy in which Kenneth lived in the house where Joseph was allegedly abused. Accordingly, our case law demands more by way of evidence here.

where respondent-mother "(1) continued to fail to acknowledge her role in her rights being terminated to her six other children, (2) denied the need for any services for J.A.M.'s case, and (3) became involved with the father, who had engaged in domestic violence even though domestic violence was one of the reasons her children were removed from her home") (internal marks omitted).

In *In re J.C.B.*, this Court reversed the trial court's adjudication of J.C.B., C.R.R., and H.F.R. as neglected where the petitions alleged that the juveniles lived in an environment injurious to their welfare because they resided in a home where another juvenile, R.R.N., allegedly had been sexually abused by the respondent-father. 233 N.C. App. at 642, 757 S.E.2d at 488. "[A]ssum[ing] *arguendo* that respondent-father abused R.R.N." our Court determined that "this fact alone [did] not support a conclusion that J.C.B., C.R.R., and H.F.R. were neglected" because the trial court failed to make any findings of fact that the juveniles "were either abused themselves or were aware of [the] respondent-father's inappropriate relationship with R.R.N." *Id.* at 644, 757 S.E.2d at 489. Furthermore, "the trial court failed to make any findings of fact regarding other factors that would support a conclusion that the abuse would be repeated[,]" which warranted reversal of the trial court's adjudications of neglect. *Id.* at 644-45, 757 S.E.2d at 489-90.

Our review of the record and the trial court's findings of fact similarly reveals that the trial court's adjudication of Kenneth as neglected is predicated on its

adjudication of Joseph as abused. The requisite additional factors supporting an adjudication of neglect are absent in the case at hand.

We first note that the majority of the trial court's adjudicatory findings of fact address Joseph's fractures and the fact that Respondents did not know how Joseph sustained his injuries. And of the nine findings of fact which mention Kenneth, only three specifically concern him:

> 9. The child, [Kenneth], lives in the same home in which the injures occurred with his younger sibling, [Joseph]. [Kenneth] was residing with his mother and mother's live-in boyfriend [Respondent-Father] and younger sibling, [Joseph] . . .
>
> . . .
>
> 12. Social Worker Munroe also interviewed the minor child [Kenneth] (8 years old) who stated he did not see his baby brother fall nor did he know how he was hurt. Social Worker Munroe asked [Kenneth] how [Respondent-Father] disciplined him. [Kenneth] responded that [Respondent-Father] talks to him and tells him what to do or sometimes makes him write sentences. [Kenneth] denied that [Respondent-Father] ever hit him. Social Worker Munroe also asked [Kenneth] how his mother disciplined him. [Kenneth] stated that his mother takes his phone away or does not allow him to play games or watch TV. [Kenneth] also reported that he was happy at his mother's home. Social Worker Munroe did not observe any bruises, marks, or physical injuries to [Kenneth]. . . .
>
> . . .
>
> 43. Moreover, the parents continue to endorse that they have no knowledge of what could have caused the six fractures in the infant, [Joseph]. Because of their lack of

> knowledge, the Court finds that the home of the parents creates an injurious environment to the welfare of [Kenneth] and continuous risk of harm to [Kenneth] at the time. [Kenneth] was living and present in the home when [Joseph] became symptomatic.

These findings cannot support a conclusion of neglect. First, as noted above, the record does not support finding of fact 9 as it relates to Joseph's injuries occurring in the home. The trial court further found that Kenneth was not abused nor was he aware of how his brother was injured. *See In re J.C.B.*, 233 N.C. App. at 644, 757 S.E.2d at 489 (holding the same counsels against adjudicating neglect in a sibling). And the trial court did not make any findings regarding "other factors" that would show Kenneth faced a "substantial risk" of neglect. *See id.* Indeed, the trial court found that Respondents were forthcoming, cooperative, and willing to work with DSS and doctors, there were no incidents of domestic violence in the home, nor current and ongoing substance abuse, nor prior DSS involvement. *Cf. In re J.A.M.*, 372 N.C. at 10, 822 S.E.2d at 699 (present risk factors included denial of services, DV in the home, and failure to acknowledge circumstances that led to TPR of six other children); *In re D.B.J.*, 197 N.C. App. at 756, 678 S.E.2d at 781 (DV in the home and ongoing substance abuse issues); *In re McLean*, 135 N.C. App. at 396, 521 S.E.2d at 127 (parents not cooperative with social worker, parents did not express concern for future safety of child, respondent-father—who had been convicted of involuntary manslaughter of his daughter—provided most of the care for the child).

The only finding of fact that attempts to establish a connection between Joseph's injuries and any risk to Kenneth is finding of fact 43. However, "lack of knowledge" of what caused an injury to one child, standing alone, is not sufficient to support an adjudication of neglect of another child. That is particularly the case where, as here, the trial court found that Kenneth was properly cared for, disciplined, supervised, and, by all accounts, happy in Respondents' home. We therefore reverse Kenneth's adjudication and remand to the trial court for further proceedings consistent with this opinion.

### III. Conclusion

For the reasons stated above, we reverse the trial court's order adjudicating Joseph neglected. We remand to the trial court on the issues of Joseph's adjudication as abused and Kenneth's adjudication as neglected. If necessary, the trial court shall in its discretion either proceed based on the present record evidence or after receiving additional evidence and argument. The trial court shall then, only if necessary, enter a new order making findings of fact and conclusions of law consistent with this opinion in deciding the legal question or questions remaining before it.

REVERSED AND REMANDED.

Judges DILLON and ZACHARY concur.